340 F.2d 97
 65-1 USTC P 9173
 Fred MONTESI and Carmela Montesi, Petitioners,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent.
John MONTESI and Yolanda Montesi, Petitioners,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent.
Frank MONTESI and Letitia D. Montesi, Petitioners,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent.
Joe MONTESI and Gloria Montesi, Petitioners,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent.
Louis F. MONTESI and Evelyn Montesi, Petitioners,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent.
 Nos. 15733-15737.
 United States Court of Appeals Sixth Circuit.
 Jan. 18, 1965.
 
 Charles H. Davis, Memphis, Tenn. (Donald W. Pemberton, Memphis, Tenn., on the brief; Montedonico, Boone, Gilliland, Heiskell & Loch, Memphis, Tenn., of counsel), for petitioners.
 Lawrence B. Silver, Atty., Dept. of Justice, Washington, D.C. (Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson, Harry Baum, Attys., Dept. of Justice, Washington, D.C., on the brief), for respondent.
 Before WEICK, Chief Judge, and PHILLIPS and EDWARDS, Circuit Judges.
 EDWARDS, Circuit Judge.
 
 
 1
 In these five income tax appeals the petitioners are Fred Montesi and his four sons and their respective wives. Each appeal concerns the treatment of $10,000 per year paid to each of the husbands for three years after the sale by them (through various companies and partnerships) of a large super market operation in Memphis, Tennessee, and the vicinity.
 
 
 2
 The sale occurred on October 11, 1955. The purchaser, National Tea Company, paid an aggregate purchase price of $2,771,379.95 to the companies and partnerships who owned the business assets.
 
 
 3
 Paragraph three of the contract for sale, which was closed October 11, 1955, provided as follows:
 
 
 4
 '3. The undersigned agree to sell to you and you agree to purchase from the undersigned the Assets for an aggregate cash purchase price (hereinafter called the 'Purchase Price') of the sum of (i) the Price for the Merchandise, (ii) the Price for the Store Fixtures, (iii) the Price for the Warehouse and Office Fixtures and Equipment and (iv) the sum of $400,000.00, all on the terms and conditions hereinafter set forth.'
 
 
 5
 It is undisputed that under the contract item (i) in this paragraph 'the Price for the Merchandise' was $1,418,565.07; item (ii) was $599,814.88, plus $30,000; item (iii) was $323,000, which with the undesignated $400,000 amount makes up the aggregate of the total purchase price of $2,771,379.95.
 
 
 6
 A provision of the sale agreement required the execution of separate agreements not to compete with National Tea for five years, which each of the male petitioners were required to and did execute individually. Typical of these agreements is the following:
 
 
 7
 '1. FRED MONTESI agrees that he will not for a period of five (5) years commencing with the date of this agreement engage in or become interested in any business which competes with the aforesaid business heretofore carried on by FRED MONTESI and the abovementioned other parties within the City of Memphis or within a radius of two hundred fifty (250) miles of Memphis (excluding, however, the city or village limits of Florence, Tuscumbia and Sheffield, Alabama), except that FRED MONTESI shall not be prohibited hereby from continuing or re-entering a wholesale jobbing grocery, produce and meat business, and in connection therewith to supply and render management or supervisory service, other than on a co-operative basis, to the Liberty Cash Grocery licensed or franchised stores.
 
 
 8
 '2. National agrees that it will pay FRED MONTESI for not competing as aforesaid Ten Thousand ($10,000.00) Dollars on March 15, 1956 and Ten Thousand ($10,000.00) Dollars on the 15th day of each March thereafter to and including March 15,1960, providing FRED MONTESI does not so compete during any of such years.'
 
 
 9
 Following the closing of this sale and the execution of the agreements not to compete, the agreements were adhered to for the full duration of the five years provided therein by all five of the male petitioners. National Tea in turn paid the $10,000 required to be paid under these agreements in each of those years to the petitioners.
 
 
 10
 The payments, aggregating $250,000, were made under these agreements to petitioners in equal shares and not in proportion to their respective interests in the assets of the super market business sold to National Tea.
 
 
 11
 It is undisputed that within two weeks after the expiration of these covenants not to compete the Montesis reentered the retail food business by opening the largest super market in Memphis in competition with the National Tea Stores.
 
 
 12
 In the years 1956, 1957 and 1958 petitioners' federal income tax returns did not show the $10,000 payments from National Tea as ordinary income. They assert that these payments were really payments for 'good will' in the purchase by National Tea of the Montesi markets and should be taxed as capital gains. The Commissioner determined, however, that the $10,000 paid each of the petitioners for the three years in question was paid for the covenants not to compete and was ordinary income. Petitioners then sought review of the decision rendered in each case before the Tax Court of the United States.
 
 
 13
 The testimony before the Tax Court showed the facts related above. It also showed that the Montesi store operations in Memphis prior to this sale were the most successful retail food marketing operations in that vicinity; that the total operation netted approximately $600,000 per year at the time of sale; and that the established good will of the Montesi stores was a valuable asset. Petitioners also introduced testimony from which they argued that the $2,771,379.95 sale price represented no more than the value of the Montesi stores' physical assets to National Tea.
 
 
 14
 From these facts and conclusions they argued before the Tax Court (and do so now before us) that the $250,000 paid by National Tea in the form of compensation for covenants not to compete was really a sum paid for the good will of the Montesi business.
 
 
 15
 After a full hearing Judge Atkins upheld the determination of the Commissioner and entered orders deciding that deficiencies existed as to each of the taxpayers involved for each of the three years involved. He thereby gave effect to his determination that the $10,000 yearly payments to petitioners were consideration for the covenants not to compete and were ordinary income.
 
 
 16
 In this regard he relied in part upon the fact that the covenants were separately signed with the Montesis as individuals, whereas the contract for the sale of the Montesi enterprises was executed by various corporations and partnerships. His opinion also stated:
 
 
 17
 'We think it logical to conclude that the specific sum of $400,000 was intended by the parties to represent the consideration for any intangibles, including good will, and that the consideration provided in the covenants not to compete was not to any extent consideration for the transfer of good will.'
 
 
 18
 His opinion also found: 'From the evidence it is clear that the agreements not to compete did have substantial value.' and it cited the fact that within a few days after their expiration the taxpayers went back into competition with National Tea.
 
 
 19
 Our review of the evidence presented in this record convinces us that there is ample support for each of the findings of fact of the Tax Court recited above. We cannot, on this record, hold that Judge Atkins' findings of fact are 'clearly erroneous.' Commissioner v. Duberstein, 363 U.S. 278, 80 S.Ct. 1190, 4 L.Ed.2d 1218 (1960).
 
 
 20
 This record demonstrates that there was arm's length bargaining; that the Montesis were capably represented and were under no economic or other pressure to accept contractual terms which placed them at an unfair position from a tax point of view; that the contracts not to compete were of significant value to National Tea, and that the parties set a separate valuation on them. This record taken as a whole does not convince us (as it did not convince the Tax Court) that the $250,000 value which the parties themselves set on these contracts was unrealistic. Cf. Toledo Blade Co. v. Commissioner, 2 T.C. 794; 11 T.C. 1079, aff'd per curiam, 180 F.2d 357 (C.A. 6, 1950), cert. denied, 340 U.S. 811, 71 S.Ct. 38, 95 L.Ed. 596 (1950); Copperhead Coal Company v. Commissioner of Internal Revenue, 272 F.2d 45 (C.A.6, 1959).
 
 
 21
 Money paid as consideration for a covenant not to compete is regarded as income received in place of that which the taxpayer might otherwise have earned in the field of enterprise from which the covenant excludes him. Mertens, Law of Federal Income Taxation 22.33.
 
 
 22
 This rationale lies behind those cases where sums paid for such covenants have been held to be ordinary income.
 
 
 23
 And where, as here, the parties have established the separate value of the covenants in what appears to be fair bargaining, it takes 'strong proofs' to overcome the effect of their own determinations. Ullman v. Commissioner, 264 F.2d 305 (C.A.2, 1959); Hamlin's Trust v. Commissioner, 209 F.2d 761 (C.A.10, 1954); Barran v. Commissioner, 334 F.2d 58 (C.A.5, 1964).
 
 
 24
 The decisions of the Tax Court are affirmed.