Charles W. **BALTHROPE** and Mary V.
Balthrope, Petitioners,

v.

**COMMISSIONER OF INTERNAL REV-
ENUE, Respondent.**

No. 21916.

United States Court of Appeals
Fifth Circuit.

Jan. 18, 1966.

Rehearing Denied March 3, 1966.

Rives, Circuit Judge, dissented.

R. N. Gresham, Claiborne B. Gregory, San Antonio, Tex., Boyle, Wheeler, Gresham, Davis & Gregory, San Antonio, Tex. of counsel, for petitioners.

Sheldon S. Cohen, Chief Counsel, Richard P. Milloy, Atty., I. R. S., Washington, D. C., Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson, David O. Walter, J. Edward Shillinburg, Attys., Dept. of Justice, Washington, D. C., John B. Jones, Jr., Acting Asst. Atty. Gen., for respondent.

Before RIVES, WISDOM, and GEWIN, Circuit Judges.

WISDOM, Circuit Judge:

Charles W. Balthrope sold his San Antonio radio station for $442,000. A provision in the original contract, later the subject of a separate agreement, allocated $150,000 of the purchase price to payments for the consulting services of Balthrope and his wife and for their covenant not to compete. When the Balthropes agreed to this allocation, apparently they were unaware of the unfavorable tax consequences. Now better advised, they contend that the agreement allocating $150,000 to consulting and non-competition covenants was a sham because the payments were in fact part of the consideration for the sale of the radio station stock and goodwill. The Tax Court held that the Balthropes had not produced the "strong proof" required to dishonor the contractual allocation. 23 Tax Ct.Mem. 156 (1964). We affirm.

### I.

Charles Balthrope began his career in radio broadcasting in 1936 as a salesman for a San Antonio, Texas, station. He became assistant manager, then transferred to another station as manager.

Balthrope set out on his own in 1947. He organized Radio KITE, Inc., a Texas Corporation in which he owned all the capital stock and secured Federal Communications Commission licensing for KITE-AM and KITE-FM. Long hours broke his health. April 2, 1958, he was hospitalized. In his physician's opinion, the only cure was rest and relief from the pressure of business.

Balthrope took his doctor's advice and decided to sell KITE, Inc. He met with William Stubblefield and DeWitt Landis, friends and brokers. After examining KITE, Inc.'s balance sheets and statement of operating expenses, the brokers estimated that Balthrope's business might sell for $400,000 to $450,000.

Stubblefield showed KITE's financial statements to Connie B. Gay, a Virginian who owned "town and country" radio stations in West Virginia, Kentucky, North Carolina, Louisiana, and Maryland. May 14, 1958, Gay met with Landis in San Antonio to negotiate for the purchase of KITE, Inc. Gay offered $400,000. Landis relayed this offer to Balthrope, who accepted it.

The three met that afternoon to draft a contract. Gay asked Balthrope to take $150,000 of the $400,000 "as a covenant not to compete, or consulting contract, or any way you want to do it." Balthrope replied: "I will give you a non-competition agreement forever. I am sick. I am not going back in the radio business in San Antonio." Gay and Balthrope discussed the non-competition agreement for about five minutes. They did not discuss the tax consequences of the agreement; Balthrope's accountant, who sometimes gave tax advice, was out of town.

Balthrope and Gay signed the "tentative sales contract" May 15, 1958. Balthrope agreed to sell the assets of KITE, Inc. and his right to compete for ten years. Gay agreed to pay $100,000 in cash and $150,000 in installments for the station, and to pay $150,000 in installments for consulting and management fees. The same afternoon Landis agreed to accept a $15,800 commission based on the "sale of KITE, San Antonio, to Connie B. Gay for $400,000."

Within a few days, Gay mailed to Balthrope two contracts representing the final agreement for the sale of KITE, Inc. Balthrope signed both contracts May 24, 1958. The first contract recites Balthrope's promise to sell his *stock* in

KITE, Inc., to Gay for $250,000 subject to the approval of the Federal Communications Commission. Gay had requested the change from sale-of-assets to sale-of-stock so that he could take advantage of KITE's pending application for night-time broadcasting. The first contract also provided that Gay would lease back to Balthrope the small KITE-FM facilities. In the second contract Gay agreed to pay Mr. and Mrs. Balthrope $150,000 in installments over a ten-year period for consulting and managerial services; if either of the Balthropes should die within the ten-year period, Gay agreed to pay the remaining installments to the survivor of the two. The Balthropes agreed not to compete within a 40-mile radius for ten years.

The parties made one modification of these contracts before the closing in August 1958. Balthrope's accountant had advised him that his retention of the "net quick assets" of the KITE, Inc. might constitute a distribution to Balthrope of a taxable dividend. Balthrope and Gay agreed, therefore, that KITE, Inc. would retain the "net quick assets" and that Gay would pay an additional $42,000 for the stock.

Between October 31, 1958, and March 17, 1960, Balthrope wrote 17 letters in his capacity as consultant to Gay. These letters suggest methods of advertising and programming. Mr. and Mrs. Balthrope also made trips to New Orleans and Kansas City on Gay's behalf to investigate broadcasting station operations. Mrs. Balthrope conducted a survey in those cities to determine the listening habits of housewives.

Balthrope engaged in his own business activities following the sale of KITE, Inc., but on a limited scale. He leased, and later bought, from Gay the broadcasting facilities of KITE-FM. He also operated a background music station in San Antonio during 1958 and 1959. He did not, however, actively manage either of these stations. For about half of each year, Mr. Balthrope was in San Antonio working three to four hours each morning and resting in the afternoon; the rest of the year he vacationed in Rockport, Texas.

In 1958 Gay paid Balthrope the net amount of $96,657.16 for stock of KITE, Inc., under the first May 24, 1958 contract. The Balthropes reported this gain in a joint return on the installment basis. IRC § 453(b). The Commissioner, however, determined that the Balthropes were ineligible for the installment method of reporting income and assessed a deficiency of $50,437.82 for 1958 and an overpayment of $4,234.84 for 1959.

The more advantageous installment method of reporting gain from the sale of KITE, Inc. stock is available to the Balthropes only if payments received during the taxable year of sale do not exceed 30 per cent of the selling price. IRC § 453(b). Since the amount of year-of-sales payments is undisputed, determination of the selling price is critical. The Commissioner contends that the selling price was $292,000, the price the contract allocated to payment for KITE, Inc., stock; that the year-of-sale payments ($96,657.16) exceeded 30 per cent of the selling price and that, therefore, the installment method was unavailable to the Balthropes. On the other hand, if, as the Balthropes contend, the selling price was $442,000 and the allocation of $150,000 for consultative, non-competitive purposes a sham, the installment method of reporting gain would be available to the taxpayers.

If the selling price is $442,000, the Commissioner concedes the Balthropes may yet have another tax advantage. Gay paid the taxpayers $5000 in 1958 and $15,000 in 1959 for consulting services under the second May 24 contract. The Balthropes reported these amounts as ordinary income in 1958 and 1959; Gay deducted the amounts as business expenses. But if the $150,000 allocated to the second contract is in fact part of the purchase price, that sum is capital gain to the Balthropes rather than ordinary income. And Gay would correspondingly get no deductions for "consulting fees."

The Tax Court found that the $150,000 Gay agreed to pay under the second May 24 agreement was not part of the purchase price for KITE, Inc., stock, but was payment for a covenant not to compete and for consulting services. 23 Tax Ct.Mem. 156 (1964). The Tax Court therefore agreed with the Commissioner that the installment method was unavailable to the Balthropes and that payments under the consultative, non-competition agreement were taxable as ordinary income rather than as capital gain. Our task is to determine whether that finding is clearly erroneous. IRC § 7482(a); Commissioner of Internal Revenue v. Duberstein, 363 U.S. 278, 291, 80 S.Ct. 1190, 4 L.Ed.2d 1218, 1228 (1960).

## II.

When a vendor covenants not to compete, conflicting tax interests of vendor and vendee usually influence the amount of the purchase price allocated to the covenant. The vendor prefers a low price for his covenant, taxable as ordinary income, and a high price for capital assets such as stock and goodwill, taxable at lower capital gains rates. The vendee prefers a high basis for the covenant with accompanying depreciation deductions and a low allocation to stock and goodwill, which are nondepreciable. See Note, Tax Treatment of Covenants Not To Compete: A Problem of Purchase Price Allocation, 67 Yale L.J. 1261, 1263 (1958); Barnet, Covenants Not To Compete, N.Y.U. 18th Inst. on Fed.Tax 861, 864–65 (1960).

Courts generally honor the parties' bargaining for tax consequences dependent upon the price of a vendor's covenant not to compete. Barran v. Commissioner of Internal Revenue, 5 Cir. 1964, 334 F.2d 58. But there are limits. Courts need not honor a vendor's covenant which has no basis in economic reality. Schulz v. Commissioner of Internal Revenue, 9 Cir. 1961, 294 F.2d 52, 53. Nor should courts honor a covenant slipped into a sales contract for tax purposes by one party to the disadvantage of a tax-ignorant party. See, for example, John W. Shleppey, Tax Ct.Mem. 1963–1965.

The vagueness of the standards for determining when a covenant is a sham has led to considerable litigation. See Note, 67 Yale L.J. 1261, 1268 & n. 40 (1958); Freling, Sales of Intangible Business Assets, Tul. 14th Tax Institute 209, 234 (1956). Under the "severability" test, if the court should determine that the primary function of the covenant is to protect goodwill transferred to the vendee, then the covenant is said to be "non-severable" from the goodwill; accordingly the vendor receives capital gains treatment for all the purchase price. If, on the other hand, the covenant is deemed unnecessary to the protection of goodwill, it is "severable"; therefore, payments to the covenantor are ordinary income and the vendee receives corresponding depreciation deductions. See Aaron Michaels, 12 T.C. 17, 19 (1949).

The "severability" test, if it does not beg the question, has been criticized as ignoring the relationship between a covenant not to compete and the sale of goodwill. Schulz v. Commissioner of Internal Revenue, supra, 294 F.2d at 55, 56; 3B Mertens, Law of Federal Income Taxation § 22.33. Any covenant not to compete must to some degree protect the reputation and customer loyalty transferred with the goodwill of the business. Indeed, the covenant is unenforceable if intended for purposes other than protecting goodwill. 6 Corbin, Contracts § 1387. The only covenant that would not to some degree protect goodwill would be a covenant that had no basis in economic reality. Since directly determining whether a covenant has economic reality is the threshold inquiry in all of these cases, the indirect "severability" test for the same purpose has little probative value and less utility. See Barran, 334 F.2d at 63.

In Barran this Court saw the basic problem as a question whether the payments allocated to the covenant not to compete are in fact payments for something else. In that case partners sold a

Georgia milk plant's assets for $550,000 to a larger Tennessee milk company. A provision in the sales contract recited that the vendors' agreement not to compete was in consideration for the vendees' promise to pay $200,000 in monthly installments. This Court honored the contractual allocation, holding that when the parties' contract for the sale of a business contains a separately stated and valued covenant not to compete, it is valid for tax purposes—*absent "strong proof" it is a sham.* After examining the economic reality of the covenant and the negotiations surrounding it, the Court found no "strong proof" that payments allocated to the covenant were in fact payments for goodwill. The *Barran* approach attributing primary importance to the parties' separately stated contractual allocation is consistent with recent decisions in other courts of appeals. E. g. Montesi v. Commissioner of Internal Revenue, 6 Cir. 1965, 340 F.2d 97; Rogers v. United States, 9 Cir. 1961, 290 F.2d 501.

### III.

■ We apply *Barran* to the instant case, although we note two factual differences between the cases. First, in *Barran* the vendors-covenantors owned the assets, including corporate goodwill, of the milk plant sold. In this case, Balthrope transferred his radio station by selling all his corporate stock. Neither he nor his wife, the other covenantor, directly owned the corporate goodwill [1] or other assets of the business. Lack of direct ownership of the transferred goodwill indicates, at least to some extent, the independence of the covenant from the goodwill and therefore supports the argument that the covenant must be recognized for tax purposes. See Richard Ullman, 29 T.C. 129 (1957), aff'd, Ullman v. Commissioner of Internal Revenue, 2 Cir. 1959, 264 F.2d 305. In *Barran* the

court rejected as too simple the reverse argument that a covenant by one who directly owns corporate goodwill, i. e., a proprietor, "by its very nature is one necessary to convey the good will and the payments thereunder should be treated as if made for good will." *Barran,* 334 F.2d at 62. Unless his covenant is a sham, the covenant of either a proprietor or a shareholder fulfills, to a greater or lesser degree, the same purpose—that of protecting goodwill. Note, 67 Yale L.J. 1261, 1265–66 (1958). Therefore, the covenantors' relationship to goodwill in this case does not effect the application of the *Barran* rule formulated in a case where there was a more direct relationship.

■ The second major difference between the two cases is that here the covenantors also sell their consulting services with their rights to compete. As pointed out earlier in this opinion, when a consulting arrangement is included with the sale of a business, the vendor and vendee have conflicting tax interests, just as they do when a covenant not to compete is included. The vendor-consultant prefers a low allocation of the purchase price for his services, which are taxable to him as ordinary income. IRC § 61(a) (1). The vendee, on the other hand, prefers a high allocation to consulting fees, which may be deductible as business expenses. IRC § 162(a) (1). Therefore, as with covenants not to compete, the parties' separately stated and valued consulting arrangement should generally be valid for tax purposes. The parties' competing tax interests will be a solid barrier to unrealistic allocations. And only strong proof that the so-called consulting fees are actually payments for something else can invalidate a sham arrangement. Estate of McDevitt, 12 Tax Ct.Mem. 57 (1953), aff'd McDevitt v.

---

1. The parties' contract does not speak of a sale of corporate goodwill and the Balthropes mainly argue that the payments allocated to the covenant were actually payments for the stock rather than payments for goodwill. But because the parties omit to mention goodwill does

not mean it was not actually conveyed if in fact the transfer enables the purchaser "to step into the shoes of the seller". See Estate of Masquelette v. Commissioner of Internal Revenue, 5 Cir. 1956, 239 F.2d 322, 325.

Commissioner of Internal Revenue, 2 Cir. 1954, 212 F.2d 439 (per curiam). What opportunity remains for unrealistic allocation does not sufficiently threaten government revenues to warrant the uncertainty of a less definite rule permitting tighter scrutiny of the parties' bargaining. Thus, the inclusion of the consulting arrangement in this case does not interfere with the application of the *Barran* approach here. The critical question becomes only slightly different: whether the payments allocated to the agreement containing the consulting arrangement and the covenant not to compete were in fact payments for something else.

## IV.

The taxpayers offer three arguments as "strong proof" that payments allocated to their separate consulting, non-competition agreement were in fact payments for KITE, Inc., stock or goodwill.

First, the Balthropes argue that their agreement had no basis in economic reality. They point to Balthrope's ill health and his oral assurance that he did not want to compete as indicating that his covenant was unnecessary and therefore worthless. His later business activities may be contrasted with those of the covenantor in Commissioner of Internal Revenue v. Killian, 5 Cir. 1963, 314 F.2d 852, who was forced by poor health to go to Florida and did not have to be paid to stay out of covenantee's business in Ohio. Balthrope remained in San Antonio at least half of each year, where he operated (although he did not actively manage) KITE-FM and a background music station. It is a fair inference that Gay thought the covenant necessary in order to secure Balthrope's acknowledged "good contact" with advertisers in the San Antonio area. Nor is this case like Schulz v. Commissioner of Internal Revenue, 9 Cir. 1961, 294 F.2d 52, where the covenant was valueless largely because it was for a minimal time (one year) and extended over a small area (one mile). The Balthropes agreed not to compete for ten years in a forty-mile area.

Several facts do tend to support the taxpayers' claim that the consulting portion of the agreement has no economic reality. There is emphatic testimony by the disinterested broker, Landis, that such an arrangement is unusual in the sale of a radio business. There is also the fact that Mrs. Balthrope, whose anticipated consulting services were part of the consideration for the agreement, had little experience in the radio business. Further, Balthrope's illness would presumably make his consulting services worth less than if he were healthy. And Balthrope's testimony that "every time they [Gay's office] were in contact with me [they] would ask me to please write a letter or something to make this consultation thing stand up" suggests an artificial arrangement.

On the other hand, it is reasonable to infer that Gay, a Virginian who had never operated a radio station in the West, would have valued the consulting services of Balthrope who had more than 20 years' experience in the broadcasting business in the San Antonio area. Indeed, as noted earlier in this opinion, the taxpayers actually rendered consulting services of value. Taking the record as a whole, we cannot say the Tax Court was clearly erroneous in finding that the agreement had economic reality.

Second, the taxpayers argue that their agreement was a sham because it was not really bargained for, or at least there was no arm's length bargaining. True, there was not, as there was in *Barran,* "much negotiation and discussion" about the consulting, non-competition agreement. Indeed, the amount of discussion devoted to the original agreement was said to be only five minutes on May 15, 1958, in the San Antonio hotel room. In addition, it is apparent that Gay was generally in control of the negotiations for the sale of the radio station, perhaps because ill health made Balthrope anxious to sell to the first taker.[2] And Gay pre-

---

2. However, Balthrope also admitted that he was anxious to sell to Gay because he thought he could get a better price from the first taker.

pared the final contracts for the Balthropes to sign.

Again the other side of the coin is more persuasive. Balthrope was an experienced man in his field, a fair match for Gay in negotiations. The record does not suggest that Balthrope's ill health so weakened him during the negotiations that he did not understand the documents he signed. It is also important that the covenant not to compete was mentioned, if only briefly, early in oral negotiations and was included in the tentative sales contract of May 15, 1958, which Balthrope typed himself. The covenant was unambiguously included with the consulting arrangement in the final May 24, 1958, signed contract. It was acknowledged by both Balthrope and Gay in their subsequent dealings. Thus, again this case is not like Schulz v. Commissioner of Internal Revenue, where the vendee slipped the covenant into the contract at the end of the negotiations with no real consideration by the vendor. In short, the taxpayers here have fallen short of presenting strong proof that they did not *understandingly* agree to exchange their consulting services and their right to compete for $150,000.

Third, the Balthropes argue that their agreement is a sham because they were not aware during the negotiations that the allocation of the purchase price to the consulting, non-competition agreement would produce such unfavorable tax consequences. Occasionally courts have relied upon the covenantor's appreciation of tax consequences as indicative of whether there was arm's length bargaining. Compare Schulz v. Commissioner of Internal Revenue, supra at 55, with Yandell v. United States, D.C.Or.1962, 208 F.Supp. 306, 307–308, aff'd, 9 Cir. 1962, 315 F.2d 141 (per curiam). Perhaps a vendee with superior knowledge of tax consequences might be able to dominate the entire negotiations so that it could not be said that the vendor understood any of his "agreements", including his covenant not to compete. But that is not this case. The taxpayer was not naive about tax matters: he wanted to arrange the transaction in order to take advantage of the installment method of reporting gain; he had his accountant review the May 24, 1958 agreement before the sale was closed and was advised that the net quick assets might constitute taxable dividends. The facts show that the taxpayer bargained for and got exactly what he agreed to.

\* \* \*

■ No one has to arrange his business affairs to satisfy the tax collector's appetite for revenues. But when a taxpayer has failed to arrange his affairs so as to minimize his taxes, he cannot expect the court to do it for him *nunc pro tunc*. In this case the taxpayer is an experienced businessman. Without securing competent tax advice, he agreed to sell for $442,000 his radio station, his consulting services and those of his wife, and their agreement not to compete. His failure to minimize his taxes at the time he agreed to sell does not confer a right to have us do it for him now. Hamlin's Trust v. Commissioner of Internal Revenue, 10 Cir. 1954, 209 F.2d 761; Cf. Rogers v. United States, 9 Cir. 1961, 290 F.2d 501.

■ As a last resort, the taxpayers ask that the Court allocate a smaller portion of the purchase price to the consulting, non-competition agreement than they agreed to with Gay. We decline to undertake this difficult task when there is no strong proof that the parties' separately stated and valued agreement is a sham.

The judgment is affirmed.

RIVES, Circuit Judge (dissenting):

I cannot escape the conclusion that the amount of $150,000.00 to be paid by Gay to Balthrope under the contract of May 24, 1958, was actually a part of the purchase price of Balthrope's stock in KITE, Inc., and was not really a payment for a covenant not to compete and for consulting services. The sale started as a sale of the assets of the radio station. No one estimated the value of those assets at less than $400,000.00. In the opinion of the

brokers, Stubblefield and Landis, the value was between $400,000.00 and $450,000.00. Gay originally offered $400,000.00 for the assets and Balthrope accepted that offer. Gay later suggested that Balthrope take $150,000.00 of the $400,000.00 "as a covenant not to compete, or consulting contract, or any way you want to do it." At that time Balthrope was without any tax advisor. He was a sick man, not going back in the radio business. Agreeing not to compete with Gay was no detriment to Balthrope and no real advantage to Gay, except taxwise. There was no genuine bargaining over such a covenant. Its discussion consumed five minutes or less and included no comments on the tax consequences which Gay obviously had in mind, and as to which Balthrope was ignorant. Balthrope accepted the written contract as prepared by Gay.

In Barran v. Commissioner of Internal Revenue, 5 Cir. 1964, 334 F.2d 58, so strongly relied on by the majority, it was pointed out, "that the price paid was substantially in excess of the value of the assets transferred" (334 F.2d at 61). Here the total purchase price, including the $150,000.00, was the minimum estimated value of the assets. There was *no* evidentiary substantiation of $150,000.00 or any other amount as a fair value for the agreement not to compete and for consultation services. The few letters which Balthrope did write were at Gay's request, simply "to make this consultation thing stand up." Mrs. Balthrope had no experience which would qualify her as a consultant. The contract which Gay prepared allocating the $150,000.00 for consulting and managerial services of the Balthropes and for their agreement not to compete provided:

> "Connie B. Gay realizes that the foregoing represents a very modest arrangement and that some further consideration should be provided. Accordingly, he further agrees that, if neither Charles W. nor Mary Virginia Balthrope should survive the term of this agreement, he will pay the remaining installments due here-

under to the estate of the last survivor but with the privilege of anticipating the balance due without penalty."

The Tax Court comments that, "This provision has the hollow ring of evidence calculated for use primarily in a tax controversy." (R. 203.) If the Commissioner took the position that the allocation of $150,000.00 to the covenant had no basis in the economic realities of the transaction, we would, I believe, not hesitate to decide with the Commissioner. While the taxpayer, in view of his ill-advised contract, has a stronger burden, I do not think that the ultimate result should be left so completely to the Commissioner. Such a system tends toward a government of men rather than of law. I cannot escape the conclusion that the allocation was a sham, and that the $150,000.00 was actually a part of the purchase price for Balthrope's stock.

I, therefore, respectfully dissent.