Robert A. Janus and Patricia J. Janus v. Commissioner. Better Brands of Illinois, Inc. v. Commissioner.
Janus v. Commissioner
Docket Nos. 1786-69, 2331-69, 1067-70.
United States Tax Court
T.C. Memo 1971-257; 1971 Tax Ct. Memo LEXIS 76; 30 T.C.M. (CCH) 1107; T.C.M. (RIA) 71257; October 4, 1971, Filed. *76 Marvin Margolis, Chicago, Ill., for petitioners Robert A. and Patricia J. Janus in Docket No. 1786-69. Karl Schelly, for petitioner Better Brands of Illinois, Inc., in Docket Nos. 2331-69 and 1067-70. Lewis M. Porter, Jr., for the respondent. SCOTT Memorandum Findings of Fact and Opinion SCOTT, Judge: Respondent determined deficiencies in the income taxes of Robert A. Janus and Patricia J. Janus and of Better Brands of Illinois, Inc., in the amounts and for the years as follows: Petitioner
Year ended
Amount
Robert A. and Patricia J. Janus
December 31, 1965
$ 4,044.06
Robert A. and Patricia J. Janus
December 31, 1966
25,271.13
Better Brands of Illinois, Inc
January 31, 1963
3,473.91
Better Brands of Illinois, Inc
January 31, 1965
4,963.94
Better Brands of Illinois, Inc
January 31, 1967
24,263.46
Better Brands of Illinois, Inc
January 31, 1968
2,556.42 1108 Some of the issues raised by the pleadings have been disposed of by agreement of the parties, leaving for our decision the following: (1) As to the individual petitioners, whether amounts paid by Better Brands of Illinois, Inc. (Better Brands) to Robert A. Janus (Robert) *77 constitute income to Robert or were in fact payments to a corporation of which Robert was an officer. (2) As to the corporate petitioner, whether payments made by Better Brands to Robert are deductible by Better Brands as commissions paid under an employment agreement or payments made for a covenant not to compete, or constitute payments which are not deductible. Findings of Fact Some of the facts have been stipulated and are found accordingly. Petitioners Robert A. and Patricia J. Janus are husband and wife who at the time of filing their petition in this case resided at Tucson, Arizona. They filed joint Federal income tax returns for the taxable years 1965 and 1966 on the cash receipts and disbursements method of accounting with the district director of internal revenue at Chicago, Illinois. Petitioner Better Brands is a corporation organized and doing business under the laws of the State of Illinois. At the time of filing its petitions in these cases, it maintained its principal office in Chicago, Illinois. Its corporate income tax returns for the taxable years ended January 31, 1963, January 31, 1965, January 31, 1966, January 31, 1967, and January 31, 1968, were filed *78 with the district director of internal revenue at Chicago, Illinois. Better Brands during all of these years kept its books and reported its income on an accrual method of accounting. On May 11, 1949, Robert and John C. Slater (Slater) entered into an agreement with Frank Scoby (Scoby) whereby Scoby consented to their acting as distributor of Miller Brewing Company (Miller) for the southern and northern portions of western Cook County, Illinois. Robert and Slater each paid $25,000 to Scoby at the time they succeeded to the rights of the Miller distributorship in Western Cook County previously held by Scoby and each of them paid Scoby $2,500 approximately 18 months later, making a total payment of $55,000. Slater operated the northern portion of the Western Cook County distributorship as John Slater Distributor and Robert operated the southern portion of the Western Cook County distributorship as Janus Beer Sales. From 1949 until September 1958 Robert operated Janus Beer Sales as a sole proprietorship. From September 1958 until its incorporation in December 1959 Janus Beer Sales was operated as a family partnership. Janus Beer Sales, Inc. (Janus), was incorporated under the laws *79 of Illinois in December 1959 to take over the Miller distributorship in Western Cook County. Janus Beer Sales and Slater each contributed half such distributorship and other assets including trucks and equipment to Janus in exchange for stock. The shareholders of Janus in December 1959 were as follows: No. of
Shareholder
shares
Robert A. Janus, Sr. [1]
410
John C. Slater
270
Theodore C. Janus
270
Robert A. Janus, Jr
270
Ruth Ann Janus
270
Carl T. Neal
5
Julius T. Skryd 5
Total
1,500
Janus engaged in the wholesale distribution of beer. Miller High Life comprised about 75 percent of the beer distributed by Janus, the remainder being Stroh's, Heineken's, and Ballantine Ale. Janus was the exclusive Miller wholesale distributor in the entire Western Cook County area until it relinquished this territory on July 31, 1965. It was also the exclusive distributor for Miller for the counties of DeKalb, DuPage, Kane, and Kendall. A Miller distributor buys the products from Miller for resale to others for its own account acting as an independent *80 contractor. It is in no sense an agent of Miller and has no authority to bind Miller in any manner whatsoever. About a year after the incorporation of Janus, the corporation acquired all of its stock held by Slater for a purchase price of $55,000. In 1965 the officers of Janus were Robert as president, his brother, Eugene Janus, as vice president, and Anthony Granato as secretary-treasurer. All three of the officers were directors of the corporation. The 1109 shareholders of Janus at that time were as follows: No. of
Shareholder
shares
Robert A. Janus, Sr
300
Patricia Janus
100
Eugene Janus
475
Anthony P. Granato
475
Joseph Michael Janus
75
James Martin Janus 75
Total
1,500
In April 1965 Robert, Eugene Janus, and Anthony P. Granato had a meeting at Janus's offices in Broadview to discuss the pros and cons of continuing the business. At that time it was concluded that the Miller distributorship in Western Cook County should be sold and that Robert was to act as an agent for the corporation in regard to the sale. Robert was to sell the distributorship rights for the highest price obtainable and deposit the proceeds into the corporation's *81 checking account. Under the distributorship arrangement with Miller the distributorship contract was not transferable. [1] However, it was not uncommon for a distributor, with Miller's consent, to sell his business or a portion thereof to another and consent to the person to whom such sale was made taking over the Miller distributorship. In this manner Miller distributorships were in effect sold with Miller's consent. *82 Robert first contacted representatives of Miller and told them that Janus was interested in selling its distributorship for Western Cook County. These representatives of Miller suggested that Robert contact Scoby who at that time was president of Better Brands. The first discussion between Scoby and Robert occurred in June 1965. Robert informed Scoby that Janus would like to sell its Western Cook County distributorship of Miller beer. No details of the proposed sale were then discussed but Scoby asked Robert to call him later. Robert called Scoby about 3 or 4 weeks later. A second meeting was arranged and at that meeting Robert told Scoby that Janus had $85,000 invested in the distributorship and wanted to get that amount out of it. Scoby told Robert that Better Brands could not pay cash for the distributorship but would consider paying 20 cents per cas of beer sold within the distributorship area for a period of 18 months. Based on the amount of business being done at that time by Janus, 20 cents per case would amount to approximately $85,000 over an 18-month period. Robert told Scoby that the corporation needed a $25,000 advance to pay off its debt to Anthony Granato, one of its *83 shareholder/directors. Paying off the loan was a prerequisite to Janus's transferring its Miller distributorship. An agreement was worked out whereby Robert would borrow $25,000 from the Exchange National Bank, secured by the agreement of Better Brands to pay for the Miller distributorship an amount of 20 cents per case sold of Miller High Life beer and Ballantine Ale in the distributorship area for a period of 18 months. The loan was to be guaranteed by both Better Brands and Scoby. Better Brands did its banking with the Exchange National Bank. In addition to agreeing to purchase the distributorship for Miller High Life beer for Western Cook County, Better Brands agreed to purchase from Janus four city trucks for $1,000 each and the July 31, 1965, Miller High Life beer inventory of Janus. Better Brands also agreed to employ approximately 16 employees of Janus who were responsible for the distribution of Miller High Life beer and Balantine ale to retailers in the Western Cook County area. The transfer was to become effective the first Monday in August 1965 (August 2, 1965). On the Friday preceding that Monday, Robert, along with Harry Menick, the vice president of Better Brands, *84 and Jimmy Carter, called in the employees who were to be employed by Better Brands and told them that beginning Monday morning they would be employed by Better Brands, which now had the distributorship of Miller in the area they serviced. Those employees who were transferred to Better Brands were truck drivers/salesmen and warehousemen. 1110 Each driver/salesman loaded the truck at the warehouse in the morning and then went out on his route, recording purchases by retailers in a book entitled, "Customers Receipt Book." Each driver/salesman who transferred to the employ of Better Brands continued to service the route that he had serviced when employed by Janus. At the time Better Brands took over the Western Cook County territory, Janus was incurring moderate advertising expenses. However, prior to that time, it engaged in extensive advertising. All trucks used by it in its wholesale distribution of beer contained markings indicating that they belonged to Janus. Prior to the actual transfer of the distributorship to Better Brands, all the agreements made by Robert with Better Brands for the sale of Janus's distributorship, trucks, and inventory to Better Brands, and for the *85 transfer of employees were oral agreements. After the transfer by Janus to Better Brands of its Miller inventory, 4 trucks, 16 employees, and the Miller distributorship but before any payment had been made for any of the items, a written document was presented to Robert for signature. The written document was as follows: EMPLOYMENT AGREEMENT The undersigned BETTER BRANDS OF ILLINOIS, INC. (an Illinois corporation hereinafter referred to as BETTER BRANDS) and the undersigned ROBERT JANUS, hereby mutually agree as follows: I. BETTER BRANDS agrees to employ JANUS for a period of eighteen months from the date of this agreement to act as a consultant, advisor and sales representative, and JANUS agrees to accept such employment and to devote his best effort thereto. II. For a period of eighteen months from the date of this agreement, BETTER BRANDS agrees to pay, and JANUS agrees to accept as his sole compensation for his services as aforesaid, commissions at the rate of twenty cents ($0.20) per case on all BALLANTINE ALE and MILLER HIGH LIFE BEER sold by BETTER BRANDS in that part of Cook County, Illinois, lying west of the center line of Harlem Avenue. Such commissions will *86 be paid to JANUS monthly, on or before the fifteenth day of the month following the month in which such sales are made. III. For a period of eighteen months from the date of this agreement, JANUS agrees that he will not, directly or indirectly, as a principal, partner, agent, officer, director, stockholder, lender of money; employee, consultant, advisor, sales representative or otherwise, engage in the wholesale distribution of wine, beer or liquor, or other business that is competitive with the business of BETTER BRANDS within the City of Chicago. IV. This agreement shall take effect August 9, 1965, and shall be binding on the parties hereto and their respective heirs, administrators, representatives, executors, successors, and assigns. At the time that Robert received and signed this document, he believed that he had no choice but to sign it if Janus was to receive the monthly payments he had orally agreed to take for the sale of Janus's distributorship rights and the payments for its trucks and inventory. He believed that Janus could have lost the payments and nothing been recovered on the investments in buying out prior distributors if he did not sign the document. He *87 believed that he could not have started any legal action to recover those payments. Robert signed the document without obtaining any legal advice and without talking with Scoby or anyone else at Better Brands concerning it. About a week after having signed the document, Robert talked to Harry Menick, vice president of Better Brands about the document. Menick told Robert not to worry about the document, that it was just going to be used as a simple sales agreement. Robert believed Menick's representation and pursued the matter no further. On or about August 9, 1965, Better Brands paid Janus a purchase price of $4,000 for the trucks it had acquired from Janus and on or about August 20, 1965, Better Brands paid Janus by check in the amount of $15,249.55 for the inventory. The price of the inventory was determined by adding to its cost f.o.b. Broadview cartage expense. On August 9, 1965, Robert executed a note payable to the Exchange National Bank to obtain the $25,000 advance. The loan was secured by the written document entitled, "Employment Agreement" and was guaranteed by Better Brands and Scoby, personally. The note was for 310 days at 6 percent interest. 1111 Robert executed *88 a renewal note dated June 15, 1966, made payable to the Exchange National Bank in the amount of $5,898.40. The renewal note extended by 121 days the period for making full payment of the amount shown in the original note. The $25,000 advance was deposited in Janus's bank account at the Bank of Lyons, Lyons, Illinois, on August 10, 1965, and the funds were used by Janus for payment of corporate obligations. It was Robert's understanding that the 20 cents per case that was to be received for 18 months from Better Brands was all that was to be paid by Better Brands for the Miller distributorship. If Better Brands lost some of the accounts serviced by Janus, then the total number of cases sold would be less and consequently the amount would be less than forecasted. If the number of cases sold to the accounts increased over previous year, the amount received would have been greater than that forecasted. Better Brands drew checks on its account with the Exchange National Bank payable to Robert or the Exchange National Bank for payment on the $25,000 note in the amounts and on the dates as follows: Date
Payee
Check No.
Amount
1965
Sept. 13
Robert Janus
13539
$ 1,611.30
Sept. 13
Exchange National Bank
13540
1,611.30
Oct. 15
Robert Janus
14046
2,291.30
Oct. 15
Exchange National Bank
14045
2,291.30
Nov. 15
Exchange National Bank
14739
2,010.00
Nov. 15
Robert Janus
14741
2,010.00
Dec. 15
Robert Janus
15579
2,020.50
Dec. -
Exchange National Bank 2,020.50
$15,866.20
1966
Jan. 14
Robert Janus
16390
2,327.60
Jan. 14
Exchange National Bank
16389
2,327.60
Feb. 15
Exchange National Bank
17175
1,543.70
Feb. 15
Robert Janus
17178
1,543.70
Mar. 15
Robert Janus
18332
2,620.90
Mar. 14
Exchange National Bank
18326
2,620.90
Apr. 14
Exchange National Bank
18673
1,704.40
Apr. 15
Robert Janus
18721
1,704.40
May 16
Robert Janus
19411
1,582.50
May 16
Exchange National Bank
19410
1,582.50
June 14
Exchange National Bank
20109
2,252.60
June 15
Robert Janus
20118
2,252.60
July 14
Exchange National Bank
20860
2,788.50
July 15
Robert Janus
20897
2,788.50
Aug. 12
Exchange National Bank
21756
3,168.26
Aug. 15
Robert Janus
21779
3,283.94
Sept. 15
Robert Janus
23203
5,397.60
Oct. 14
Robert Janus
23550
4,546.40
Nov. 15
Robert Janus
24908
4,715.00
Dec. 15
Robert Janus
25281 3,936.20 $54,687.80
1967
Jan. -
Robert Janus
1,304.55
Jan. 16
Robert Janus
26130
4,408.80
Feb. 15
Robert Janus
26950
3,014.00
Mar. 15
Robert Janus
28029 1,075.60
$ 9,802.95
Total $80,356.95
*89 Better Brands accrued the amounts of these checks on its books and records and deducted on its corporate income tax returns the sums of $23,608.80, $55,672.55, and $1,075.60 for its taxable years ended January 31, 1966, January 31, 1967, and January 31, 1968, respectively. All the checks drawn by Better Brands to Robert were endorsed by him and deposited in Janus's checking account and were used to pay corporate obligations. Robert received no direct benefits from the amounts paid by Better Brands. Robert received no payments of any kind from Janus in 1965 and 1966 except his salary which was $13,000 for each of the years. Prior to Better Brands taking over the Miller and Ballantine distributorships from 1112 Janus, Anthony Granato took over from Janus its distributorship rights for the wholesale distributing of Stroh's beer. Better Brands was also to take over the Heineken's distributorship but this did not materialize. Someone else eventually took over the Heineken's distributorship. In early 1968 Janus showed a balance sheet deficit. At the time of Janus's dissolution in 1968, $20,000 in corporate debts still remained to be paid after distribution of all its assets *90 to its creditors. Robert never performed services of any nature for either Scoby or Better Brands in connection with the document entitled, "Employment Agreement" or in any other connection. He was never called upon by Scoby or Better Brands to perform any service or give any recommendations. In August 1965 Robert resided in Oakbrook, Illinois. After Janus discontinued its warehouse in Broadview, Illinois, Robert moved to Carolstream, Illinois, to be near the Geneva warehouse. In May 1966 Robert moved to Waterloo, Iowa, to operate a distributorship the corporation had taken over in that area. Robert lived in Waterloo until about February 1967. During this time Eugene Janus ran the Geneva operation. Robert and his wife did not report on their income tax returns for either 1965 or 1966 any amount of income as "commissions" or payments from Better Brands. Respondent in his notice of deficiency to Robert and his wife increased their reported income by $15,866.20 for 1965 and $59,096.60 [2] for 1966 with the explanation that these amounts constituted commissions received by Robert in those years from Better Brands. *91 Respondent in his notice of deficiency to Better Brands disallowed the claimed deductions for payments made to Robert or to the Exchange National Bank on payment of Robert's note with the explanation that the deductions for these payments were not allowable because they represented payments for goodwill or other intangibles having an indeterminate useful life. Opinion Respondent states that he is a "stakeholder" in this case merely seeking to have the payments made by Better Brands by checks issued to Robert or to the Exchange National Bank for payment on the note executed by Robert treated "uniformly as to both parties." Respondent then proceeds to argue as his prime position that when Harry Menick, a vice president of Better Brands, told Robert a week after Robert had signed the written document presented to him by Better Brands that the document was going to be treated as a simple sales agreement, the written "agreement" was discharged by novation and the payments thereafter made were under the new oral agreement of sale. Respondent contends that viewed in this light the payments by Better Brands were nondeductible since they were for a capital asset without an ascertainable *92 useful life and Robert received no income from the payments. Robert's position is that the payments received by him were received as agent for Janus pursuant to an oral contract for sale of distributorship rights for Miller High Life beer by Janus to Better Brands and therefore were not income to him. Robert argues that the written document he signed was a "sham" and should be disregarded. Better Brands contends that the payments made by it to Robert were made pursuant to a written employment agreement between the parties and are therefore deductible as ordinary and necessary business expenses. Better Brands contends that under either the "strong proof" rule of such cases as Balthrope v. Commissioner, 356 F. 2d 28 (C.A. 5, 1966), affirming a Memorandum Opinion of this Court, or "the more stringent Danielson rule" ( Commissioner v. Danielson, 378 F. 2d 771 (C.A. 3, 1967), reversing 44 T.C. 549 (1965)), the provisions of the written document signed by Robert and Scoby on behalf of Better Brands should be determinative of the intention of the parties as to the character of the payments. In our view this case presents a purely factual problem. *93 The factual question is for what were the payments by Better Brands made and who had the right to retain these payments. If the substance of the transaction was that the payments made by Better Brands were payments to Janus for its Miller distributorship in Western Cook County, those payments were not in substance made "pursuant to a written employment agreement" irrespective of the form the payments took. Under these 1113 circumstances such cases as Balthrope v. Commissioner, supra, and Commissioner v. Danielson, supra, have no application to this case. We conclude from all the facts in this case that all the checks drawn to Robert or to the Exchange National Bank by Better Brands for discharge of Robert's note were in fact for payment for Janus's consent to Better Brands' taking over its Miller distributorship in Western Cook County. The facts are clear that Janus had the rights to the Miller distributorship in Western Cook County prior to the time this distributorship was taken over by Better Brands. The facts also show that a Miller distributorship in this area was valuable. In 1949 Robert and Slater had paid Scoby $55,000 for his consenting to their *94 taking over the Miller distributorship to he then held in the Western Cook County area. The indication from the facts in the record is that rights to the Miller distributorship in the Western Cook County area had increased in value between 1949 and 1965. It was Janus and not Robert who had the Miller distributorship rights. The right to be paid for consenting to another's taking over the Miller distributorship in its territory was a valuable intangible property of Janus even though the consent of Miller to the taking over of such rights was also required. The facts here show, as respondent contends they do, that the payments by Better Brands were for the rights to the Miller distributorship in the Western Cook County area. The holdings in such cases as Balthrope v. Commissioner, supra, and Commissioner v. Danielson, supra, deal with situations where the Government is taking the position that parties to a contract for sale of a business should be bound by the allocations of the purchase price as stated in their contract. The Court in Commissioner v. Danielson, (378 F. 2d at 774) stated: * * * we are not here involved with a situation where *95 the Commissioner is attacking the transaction in the form selected by the parties, e.g., Schulz v. C.I.R., 294 F. 2d 52 (9th Cir. 1961). Where the Commissioner attacks the formal agreement the Court involved is required to examine the "substance" and not merely the "form" of the transaction. This is so for the very good reason that the legitimate operation of the tax laws is not to be frustrated by forced adherence to the mere form in which the parties may choose to reflect their transaction. Gregory v. Helvering, 293 U.S. 465, 55 S. Ct. 266, 79 L. Ed. 596 (1935); C.I.R. v. Court Holding Co., 324 U.S. 331, 65 S. Ct. 707, 89 L. Ed. 981 (1945) * * * Balthrope v. Commissioner, supra, involved the sale of the assets of a going business under a contract which included a covenant by the former chief officer and sole stockholder of the business not to compete. The purchase price of the assets of the business and the payment for the covenant were separately stated in the contract. The Court in Balthrope v. Commissioner, supra, stated the "critical question" to be whether the payments allocated to the covenant not to compete *96 "were in fact for something else." In the instant case we would have to assume contrary to the clear facts in this record that Janus gave up its Miller distributorship for nothing in order to conclude as Better Brands would have us do that the payments made to Robert or the Exchange National Bank on his note were not payments for Janus's Miller distributorship. At the time of the transfer of the Miller distributorship by Janus, Robert owned directly only one-fifth of Janus's stock and his brother, Eugene, and Anthony Granato together owned over threefifths of the stock. Therefore, Robert was not in the position of a sole owner of a company who could if he chose transfer corporate rights for a personal payment to him. Since we conclude that the payments made by Better Brands to Robert or the Exchange National Bank on his note were in fact for the transfer to it of Janus's Miller distributorship, the fact that Robert signed a document entitled, "Employment Agreement" presented to him by Better Brands is unimportant. The respondent takes the position in this case that the substance of the transaction is a payment by Better Brands for the Miller distributorshi and we agree. We therefore *97 hold that Better Brands is not entitled to deduct the payments made to Robert or to the Exchange National Bank in payment on his note. Because of the view we take of the problem in this case, it is unnecessary to discuss whether the so-called "employment agreement" or "covenant not to compete" had any "economic reality." It is, however, obvious from the facts in this record that they did not. Robert did no work for Better Brands and did not even continue to live in the Western Cook County area. The so-called "covenant not to compete" covered the "City of Chicago," an area in 1114 which insofar as this record shows, Robert had never engaged in distributing beer. The record shows that Robert did in fact turn over the proceeds of the $25,000 note and of all checks which he received from Better Brands to Janus. The facts in this record show that he was directed by Janus to "sell" its Miller distributorship. Robert as chief officer for Janus turned over that company's Miller distributorship to Better Brands with the understanding that Janus would receive 20 cents per case of beer sold in the distributorship area for 18 months in payment for the turning over of its Miller distributorship *98 rights. Because of his fiduciary relationship to Janus, Robert was obligated to see that Janus obtained such payments. We need not decide whether Robert received payments from Better Brands as "agent" for Janus. The record is clear that he had an obligation to turn over to Janus amounts equal to all the amounts he received from Better Brands and he in fact discharged this obligation. Therefore, Robert did not receive from Better Brands funds which he was entitled to or did in fact retain. The amounts paid to him or to the Exchange National Bank on his note by Better Brands were not income to him. Decision will be entered under Rule 50. Footnotes
1. Robert A. Janus, Sr., is the same person as Robert A. Janus and is referred to as Robert throughout this opinion.↩
1. Printed agreements between Miller Brewing Co. and its distributors contain the following language concerning the transfer of Miller franchises: We understand that a Miller franchise can never be sold. You charge us nothing for the franchise and permit no one else to do so. We are to pay no one for the right to sell Miller beer. We may buy or rent someone else's warehouse, his trucks, his equipment, and his good will, but whether or not he is or had been a Miller distributor gives him no right to sell us a Miller franchise. It may in some cases be a good business practice to buy out a former distributor, but he cannot sell nor can we buy a Miller franchise. You reserve the right to designate your distributors. * * * For good business reasons our relationship is a personal one. We may not assign the right to sell Miller beer. We understand also that we may not change the nature of our partnership to a sole proprietorship or corporation, without having such new company submit a new application and securing your approval thereto.↩
2. It is stipulated that this figure should have been $54,687.80.↩