**RADIO MEDFORD, Inc., a corporation, Plaintiff,**
v.
**The UNITED STATES of America, Defendant.**
**Civ. No. 8353.**

United States District Court
D. Oregon.
March 21, 1957.

———◆———

Davidson, Duffy & Stout, Portland, Or., for plaintiff.

C. E. Luckey, U. S. Atty., Edward J. Georgeff, Asst. U. S. Atty., Portland, Or., James P. Garland, John J. Sexton, Attys., Dept. of Justice, Washington, D. C., for defendant.

EAST, District Judge.

On or about April 7, 1950, plaintiff entered into a written agreement with one Blanch Virgin Randle to purchase from her the Radio Station KMED, located in Medford, Oregon, for a total price of $290,000. The said agreement contained the following provision:

"The Seller agrees that she will not for a period of ten years from the date of this contract directly or indirectly engage in the radio broadcasting business within a radius of 100 air miles from Medford, Oregon, or aid or assist anyone else in said business within said 100-air mile radius, except as an employee of the Buyer."

The aforesaid written agreement provided, inter alia, the following recital:

"Whereas, the buyer has agreed to purchase said radio broadcasting business, together with such real and personal property herein described, and the said license as hereinabove set out, for the prices set out in Exhibit "C" hereof totaling Two Hundred Ninety Thousand and no/100 ($290,000.00) Dollars, and"

the said Exhibit "C" being in words and figures, as follows:

| | |
|---|---|
| "Tower | $ 12,000.00 |
| F. M. land | $ 1,700.00 |
| KMED land | $ 2,000.00 |
| Technical equipment, excluding spare parts and supplies | $ 90,000.00 |
| Furniture and Fixtures, etc. | $ 15,000.00 |
| Building | $ 45,000.00 |
| All other assets | $124,300.00" |

Plaintiff commenced operation of the radio station on July 1, 1950. In filing its corporation income tax return for its fiscal year ending March 31, 1951, plaintiff allocated a value of $82,667 to the seller's covenant not to compete, as set forth above, and claimed a deduction in the amount of $6,200.02 on said return for amortization of the covenant not to compete. Plaintiff kept its books of account and filed its income tax returns on the accrual basis of accounting.

In due time the District Collector of Internal Revenue for this District disallowed the claimed deduction of $6,-200.02, and proposed a deficiency of income tax by reason of such disallowance, in the amount of $1,522.43. This deficiency of tax and interest thereon was paid by the plaintiff. Thereafter in due time plaintiff made its refund claim which was denied by the director and in this action plaintiff seeks to recover said deficiency of tax and interest in the aggregate of $1,739.38.

There are presented in these proceedings to the Court two issues to be determined:

### I.

Whether or not seller's covenant not to compete was a severable item of the agreement of April 7, 1950.

### II.

If the Court determines that seller's covenant not to compete was a severable item, then the Court is to determine the value, if any, of such covenant and the amount of the amortization thereof allocable to plaintiff's fiscal year ending March 31, 1951.

At the outset it is to be recalled that the terms of the written agreement of sale did not treat the seller's covenant not to compete as a severable item and if a location for said item is to be found in the contract of sale as interpreted by Exhibit "C", it must be in the segregated item of—"all other assets . . $124,300." The best description of "all other assets" as appears from the evidence is found in the testimony of Mr. Roberts (Tr. 50–51):

"Q. Now, what was included in this category called 'all other assets' for which a figure is given of $124,300? A. Well, all of the interest that she had into the broadcasting business known as KMED with the exception of the real property which was described and personal property and furniture and fixtures. That included the federal license No. 83 to broadcast, it included all engagements and benefits, advantages, and contracts, and applications pending, which had been entered into by the seller or which she might have an interest.

"Q. Now, in using that language, sir, were you referring or reading

from the language contained in Paragraph numbered 1 in the contract? A. I am on page 2."

It, therefore, necessarily follows that the claimed asset of seller's covenant not to compete is mingled with other assets with a combined fixed price and value of $124,300. This, of itself, is not fatal to the plaintiff's contention for, under the doctrine of Wilson Athletic Goods Mfg. Co. v. Commissioner, 7 Cir., 222 F. 2d 355, 357, we are not bound by the strict terms of the agreement but

"we must examine the circumstances to determine the actualities and may sustain or disregard the effect of a written provision or of an omission of a provision, if to do so best serves the purposes of the tax statute."

"Therefore, it * * * is our duty here to ascertain the true intent," of the parties.

This Court is satisfied from the evidence that in the negotiations leading up to the ultimate written contract there was discussion between the respective representatives of the parties as to the plaintiff's claim of a value to the seller's covenant not to compete and its desire to:

(a) Treat seller's covenant not to compete as a separate and severable item; and

(b) Allocate a specific stipulated price or value for the item.

And, too, the Court is satisfied from the testimony of the most reputable and distinguished witnesses appearing that no meeting of the minds nor ultimate agreement between the plaintiff, buyer, and the seller on either of said two expressed desires of the purchaser, was ever obtained or reached.

Witness H. B. Murphy testified, inter alia:

"Q. Was this item of the covenant not to compete treated in those negotiations as a separate and severable item? A. Our undertaking was to reach an agreement with the seller to allocate a given sum of money to the value of that agreement. And I don't recall just where in the whole negotiations that that matter came up, but I was present when the discussion was opened by Mr. McAllister, and I was present when the final answer was given on that subject.

"Q. What was Mr. Roberts' or Mr. Kellington's reaction to the request for the allocation of the specific item to the covenant not to compete? A. I think I could recall the exact words, but I am not sure. The request was made and it was taken under consideration or consultation with the principals, *but eventually we declined to allocate any given sum of money to that item.* (Emphasis supplied.)

"Q. Did those negotiations continue even after the agreement of April the 7th was entered into? A. Well, they extended over some reasonable period where the request was made. Consideration was given and then, as I recall, *the answer was negative.* And we asked that further consideration be given it because of the merit of the request." (Emphasis supplied.)

Again,

"Q. Did you and Mr. McAllister (Attorney for buyer) ever come to an agreement of any kind with Mr. Roberts or Mr. Kellington about how much of the total purchase price should be allocated to the covenant not to compete? A. No, we did not, not in my recollection. We attempted to but were unsuccessful."

The now Mr. Justice McAllister, witness for the plaintiff, testified, inter alia:

"A. We were able to agree on the amount to be allocated to the tangible assets but we were not able to reach an agreement with regard to the amount to be allocated to the covenant not to compete."

In connection with the defendant's theory, Mr. Roberts, attorney for the seller, testified, *inter alia*:

"Q. In your negotiations with Mr. McAllister and Mr. Murphy in connection with the sale of the station did you subscribe any value to the covenant not to compete? A. I did not.

"Q. Why was that, sir? A. Well, because of this reason: Mrs. Randle was of an age that I didn't think that she would ever go into this kind of business. She was bothered about the necessary financial arrangements which were— would have to be made if television were procured, which would mean a tremendous expenditure of money and I felt satisfied from my conversations with her and from my knowledge of her that she would not go into a radio business again.

"Q. How had Mrs. Randle come to go in the radio business in the first place? A. You will have to ask somebody else. I don't know that. She and her husband were engaged in a business and her husband died and she just continued on. But why they went into it in the first place, I am assuming that they thought it would be a profitable business, which it was.

"Q. Well, when did Mrs. Randle and her husband first go into the business? A. Sometime in the '20's, I think.

"Q. When did her husband die? A. I heard it said here sometime the early '30's and I think that is probably correct.

"Q. Then she carried on the radio station thereafter? A. From that time on, yes.

"Q. How old was Mrs. Randle in 1950, do you recall? A. I don't recall. But she was not an elderly woman, but she was along in years. Not as old as I am and I don't consider myself elderly.

"Q. Did it make any difference to you whether or not the covenant not to compete was included in the contract? A. In so far as I was concerned it made no difference, no.

"Q. Did it make any difference to you whether or not anything was allocated to the covenant not to compete? A. Yes, I think it probably made a difference because of the fact that under the circumstances if it were it might be considered as ordinary income to herself. If it would have been of *an unsubstantial amount* I probably would have agreed to it." (Emphasis supplied.)

The foregoing testimony of representatives of the respective parties points up the totally adverse positions of the parties with reference to treating seller's covenant not to compete as a severable and distinct item of purchase by the purchaser.

 The test for determining issue I, with respect to the positions of the vendor and vendee, has been succinctly stated by the 10th Circuit in Commissioner of Internal Revenue v. Gazette Tel. Co., 209 F.2d 926, at page 928, as follows:

"Where a lump sum is paid for the properties of a going business together with intangibles and a covenant on the part of the seller not to compete with the purchaser or his assignee for a specified period of time, and the covenant against competition is not treated separately in respect to cost and value but is nonseverable, the purchaser has no warrant in the statute or the regulation to treat any part of the price paid as the cost of the covenant subject to depreciation. Toledo Blade Co. v. C. I. R., 11 T.C. 1079, affirmed, 6 Cir., 180 F.2d 357, certiorari denied, 340 U.S. 811, 71 S.Ct. 38, 95 L.Ed. 596; Burke, 18 T.C. 77. On the other hand, in a transaction in which property is sold and the seller covenants not to engage in business in competition with the

purchaser for a specified period of time, if the parties in good faith and realistically treat the covenant in a separate and severable manner in respect to value and cost the purchaser may amortize the price paid for the covenant and claim annual deductions pro rata during the life of the covenant. Farmers Feed Company of New York, 17 B.T.A. 507; Christensen Machine Co., 18 B.T.A. 256; Eitingon-Schild Company and Subsidiaries, 21 B.T.A. 1163; B. T. Babbitt, Inc., 32 B.T.A. 693; Christensen Machine Co. v. United States, 50 F.2d 282 [73 Ct. Cl. 149]."

The plaintiff urges that the Wilson case, supra, is controlling in its favor. It is to be recalled that the contract in the Wilson case was silent as to an allocation or severability of the item of the seller's covenant not to compete. Nevertheless, the doctrine of the case holds that the Court must look to the true intent of the transaction as above expressed.

This Court is of the firm opinion that the factual situation of the Wilson case completely distinguishes it from the instant case, for, in the Wilson case it appears that—

"The witness [for purchaser Wilson] said further, that his company was not interested in purchasing the good will of Wisconsin; [seller, sport shoe manufacturer] that it had its own distribution means and method, its own customers' lists, and its own brand names; that the Wisconsin company had no good will to which he could ascribe any value to the taxpayer [purchaser], but that it did have the factory and the machinery which petitioner [purchaser] desired, and which it could use, provided it had a covenant on the part of the owners not to compete * * * and that the covenant not to compete should have been valued at the entire $142,000 rather than $132,000 which the accounting department allocated to it.

He *emphasized that assurance of non-competition was the important element of the entire transaction.* [Emphasis supplied.]

"The Commissioner *offered no evidence controverting the truth of this testimony.* [Emphasis supplied.] One of the partners of the Wisconsin Company testified, when called as a witness by respondent, that he and his brother were of the respective ages of 59 and 62; that they did not seriously plan on retiring; that they were still of an age when retirement 'perhaps would not be considered.' "

The Court concluded:

"From the uncontroverted evidence, then, it appears that the $132,000, so far as the petitioner was concerned, represented the cost of the covenant not to compete. No finding to the contrary is supported by the evidence. * * * Where realistically and actually the covenant has a discernible value, the purchaser, of course, may amortize the price paid for it and claim annual deductions pro rata during the life of the covenant."

So, pursuing our chore of finding the good faith and true intent of the parties to the transaction involved we must look to all the surrounding circumstances. Unlike the situation in the Wilson case we find in the instant case a definite improbability that the seller would ever re-engage in the radio transmission business or otherwise enter competition with the buyer. In the Wilson case there was no good will involved and in the instant case certainly, and at least, the radio station entertained good will of its advertising customers at the time of the purchase.

In the Wilson case the seller received valuable considerations for their promise to desist from the business of their training and experience and to seek new fields of endeavor for gain as they were not considering retiring. The value received for this covenant was compensation to them and properly taxable as

such. In the instant case we find the seller retiring from the business world and merely disposing of some of her capital assets. To point up the conflicting interests taxwise between the buyer and the seller, in the instant case we find that the theory of the plaintiff would be beneficial to it on the basis of allowance for a depletion of a capital asset, while on the other hand a like value would be income of the seller and consequently taxable as such.

Any concept of good faith and true intent of the parties must necessarily mean a meeting of the minds. It appears conclusively from the evidence that the plaintiff, purchaser, asked for a severable treatment and an agreed segregated price and value upon the seller's covenant not to compete. No such agreement was consented to by the seller or ever reached between the parties.

It further appears that the plaintiff, purchaser, argued that the covenant not to compete had a value, and the seller constantly failed to assent to and denied the same. Further, at all times the seller refused to assent to plaintiff's request for a segregated price value and did not agree to the same. In view of this constant position of the seller, the plaintiff, purchaser, still took the contract under its written terms and tenor and this Court will not hear it now say that the bona fide intent of the parties was otherwise.

The treatment of the seller's covenant not to compete and the allocation of a price or value thereto, was the unilateral action of the buyer and the Court is of the opinion from all the evidence in the case as to the surrounding circumstances of the parties and of the negotiations leading up to the ultimate meeting of the minds as written out in the ultimate contract of sale, that there was no mutual good faith, intentional treatment or dealing of the seller's covenant not to compete as a severable item of discernible value, from the lump item—"all other assets."

Having reached the foregoing conclusion, it is not necessary to deal with issue No. II.

Counsel for the defendant is requested to submit proposed findings of fact, conclusions of law and judgment in conformity with the foregoing within 15 days from the date hereof. Plaintiff may have 15 days from receipt thereof within which to object to such proposed findings and submit counter-proposals.