The **REUBEN H. DONNELLEY CORPO-RATION**, Plaintiff,

v.

**UNITED STATES of America,** Defendant.

No. 64 Civ. 657.

United States District Court
S. D. New York.

July 20, 1966.

Fredrick A. Yonkman, New York City, for plaintiff; Barbara Woodward, New York City and Sidley, Austin, Burgess & Smith, Chicago, Ill., by Walter J. Cummings, Jr., Richard H. Compere, Chicago, Ill., of counsel.

Robert M. Morgenthau, U. S. Atty., Southern District of New York, for defendant; Mitchell Rogovin, Asst. Atty. Gen., Washington, D. C., Richard M. Roberts, Acting Asst. Atty. Gen., Washington, D. C., C. Moxley Featherston, David A. Wilson, Jr., Donald R. Anderson, Department of Justice, Washington, D. C., of counsel.

## OPINION, FINDINGS OF FACT AND CONCLUSIONS OF LAW.

LEVET, District Judge.

In this tax refund action the plaintiff, The Reuben H. Donnelley Corporation (hereinafter "Donnelley") seeks to recover $105,292.80 plus interest which it paid pursuant to corporate income tax deficiencies for the taxable years 1953 through 1957. The complaint is in two counts. The first count seeks to recover $33,274.39 plus interest on the ground that a deduction representing the amortization on a covenant not to compete held by Donnelley was erroneously disallowed in 1955, 1956 and 1957. The second count seeks to recover $72,018.41 plus interest on the ground that certain sums relating to a contract between Donnelley and the Illinois Bell Telephone Company were erroneously included in income for the taxable years 1953, 1954, 1955, 1956 and 1957. The government's answer sets up a setoff, alleging that in 1955, 1956 and 1957 the taxpayer erroneously deducted as salary expense certain amounts which were in fact paid to purchase a capital asset.

After hearing testimony of the parties, examining the exhibits, the pleadings, the briefs and proposed findings of fact and conclusions of law submitted by counsel, this court makes the following Findings of Fact and Conclusions of Law:

### FINDINGS OF FACT

#### I.

#### COVENANT NOT TO COMPETE [1]

1. On April 18, 1955, at a special meeting of the Executive Committee of Donnelley, the President reported on the developments in connection with the proposed purchase of the Case-Shepperd-Mann Publishing Corporation. The minutes then state:

"Further discussion was had and it was stated that the sellers should also agree that for a period of ten years from the date of sale they would not, except with the prior written consent of the buyer, engage in any competition in the fields serviced by these four trade magazines."

A motion was passed authorizing negotiation at the original tentative figure discussed of $500,000 and then this resolution appears:

"BE IT ALSO RESOLVED That negotiations be continued as to buying the corporation outright if contractual guarantees are given releasing Donnelley from all liabilities, either against Case-Shepperd-Mann Corporation or individually against the present owners, and that agreement is reached on the covenant not to compete."

2. On April 25, 1955, a so-called "Agreement of Understanding Between The Reuben H. Donnelley Corporation and Case-Shepperd-Mann Publishing Corporation" was executed. The agreement provided for the sale of all of the stock of the Case-Shepperd-Mann Publishing Corporation owned by Messrs. I. Herbert Case, Frederick Shepperd, and Karl M. Mann, to Donnelley for the sum of $715,000 and for the furnishing by the sellers of a warranted balance sheet

---

1. The Findings of Fact in Section III (Salary Expense Deduction) should be considered in connection with and as a supplement to the Findings of Fact in this section.

showing "assets of a fair market value of approximately $215,000.00, not including good will, book plates, stencils, etc." A further provision read: "Messrs. Case, Shepperd and Mann agree not to enter into the fields serviced by these publications [that is, the four magazines concerned] in any competing manner."

3. On May 18, 1955, at a meeting of the Board of Directors of Donnelley, Curtiss E. Frank, Executive Vice President, was authorized to enter into a contract with Messrs. Case, Shepperd, and Mann for the purchase of the entire outstanding stock of Case-Shepperd-Mann Publishing Corporation and "an agreement with said individuals not to compete with this Corporation, directly or indirectly, by engaging in the publication, sale or distribution of [certain magazines] for a period of ten (10) years for an aggregate consideration of Seven Hundred Fifteen Thousand Dollars ($715,000) * * *."

4. On June 8, 1955, Donnelley closed the agreement of sale with Messrs. Case, Shepperd, and Mann whereby Donnelley bought 710 shares of the capital stock of Case-Shepperd-Mann Publishing Corporation, being all of the issued and outstanding stock, at a total purchase price of $715,000.00. The said agreement contained an agreement on the part of the sellers not to compete, which provided as follows:

"12. The Sellers agree that for a period of ten (10) years from the date of closing herein they will not directly or indirectly engage in the publication, sale or distribution of a magazine in the fields serviced by FIRE ENGINEERING, WATER WORKS ENGINEERING, WASTES ENGINEERING AND ELECTRICITY ON THE FARM except with the prior written consent of the Buyer."

Paragraph 14 of the said agreement provided:

"14. This agreement is not severable."

5. The covenant not to compete was never discussed at length by the sellers among themselves during the period of negotiations prior to the sale. The sellers believed, however, that the giving of such covenants was customary in transactions as the one involved in this case. There is testimony that Case discussed with his advisor, Morris Goldman, why the covenant had been changed from five to ten years in a final draft, but that is the only discussion which appears with regard to the covenant. Goldman said ten years was customary. Case reported the change to Mann and Shepperd, who had no objection.

6. The sellers never stated to each other or to any representative of Donnelley that the covenant had value or was of substantial value. Mann and Shepperd, however, testified that they believed the covenant had substantial value, although they had not discussed it. Case felt it had value, but he never considered whether its value was substantial or not.

7. Morris Goldman, an advisor to the sellers, testified that he recommended that they grant a covenant not to compete before the final price was set. All that was mentioned was that the sellers would have to grant a covenant, and one was granted when Donnelley requested it. Goldman said that neither a cost nor a specific allocation for the covenant was discussed.

8. None of the sellers at any time intended to allocate a dollar value to the covenant. None ever discussed an allocation of dollar value or a specific value for the covenant with anyone else. There is testimony that the tax advisor of the sellers, one Bell, declined for tax reasons to place a dollar value on the covenant in the agreement when he was asked to do so by Frank, Donnelley's representative.[2]

9. No dollar value was fixed for the covenant in the agreement of June 8, 1955.

---

2. This testimony is uncorroborated. Bell was not available at the time of trial. I find it of little weight.

10. The balance sheets of Case-Shepperd-Mann Publishing Corporation attached to the sales contract of June 8, 1955 show the following valuation of assets as of April 30, 1955 (Ex. 4):

ASSETS

| | |
|---|---|
| Current assets | $298,846.69 |
| Furniture, Fixtures and Equipment | 8,337.16 |
| Goodwill, Copyright and Subscription Lists | 107,891.90 |
| | $415,075.75 |

LIABILITIES and CAPITAL

| | |
|---|---|
| Current Liabilities | $ 98,063.38 |
| Capital Stock | 71,000.00 |
| Surplus | 246,012.37 |
| | $415,075.75 |

11. After the June 8, 1955 closing, Donnelley determined that $210,000 was the value paid for the covenant and set up that amount on its books as the price paid for the covenant. There was testimony that Donnelley informed the sellers at the closing that it was placing a dollar value on the covenant; however, the evidence is insufficient to warrant such a finding. I do not find the testimony of Frank and Fager on this factual issue persuasive. Furthermore, all of the sellers testified that they did not recall such a statement.

In his report of the closing, Frank stated:

"The three tax questions were resolved prior to the closing as follows:

"(a) * * *

"(b) * * *

"(c) Immediately upon acquisition of the stock a value will be placed on the Donnelley books upon the covenant not to compete. Mr. Warner will determine what value is to be attributed to the covenant based on the facts of the case. This was explained to the Sellers at the closing." (Ex. 21)

12. In a report dated June 29, 1955, H. W. Warner, Treasurer of Donnelley, indicated that he had determined "that the amount of $210,000 is the value paid for the covenant 'not to compete' " and directed that an entry be made on the books to this effect. The report does not state how he arrived at the sum of $210,000. (Ex. 6) Other testimony reveals that Warner computed the $210,000 by allowing $7,000 per year for ten years to each individual for not competing. This figure corresponded in many respects to the annuity under Donnelley's retirement plan that a Donnelley employee would receive who had worked for Donnelley for thirty years at an average salary of $20,000.

13. In a report dated June 28, 1955, D. W. Kendrick of Arthur Andersen & Co. stated that the $210,000 figure "would result in assigning about one-half of the cost of the intangible to goodwill and one-half to the covenant not to compete." (Ex. 8)

14. Everett C. Johnson, a partner in Arthur Andersen & Co., testified that the $210,000 figure was a fair one to be assigned to the covenant. He did not, however, have any information as to any negotiations between the sellers and Donnelley as to a separate amount to be paid for the covenant. Johnson also did not have any specialized knowledge as to the value of a covenant not to compete in the publishing business.

15. At a meeting of the Board of Directors of Donnelley on July 27, 1955,

it was determined that the amount paid and to be paid for the Case-Shepperd-Mann Publishing Corporation should be divided as follows:

$430,000 – Proportion of Capital Stock payment.
 75,000 – Escrow payment to Irving Trust Company, Escrow Agent.
$505,000 – Representing the purchase of the capital stock of the Case-Shepperd-Mann Publishing Corporation.
 210,000 – Covering the value of the covenant between I. Herbert Case, Karl M. Mann and Frederick Shepperd not to compete.

$715,000 – Total amount paid. (Ex. 9)

———◆———

16. On August 24, 1955, Warner authorized that appropriate entries for the purchase price be made as follows:

"Original purchase price .............................$715,000.00
Covenant not to compete ........................... 210,000.00
 $505,000.00
Net values capitalized established through Journal #1 ... 251,312.85
 $253,687.15"
 (Ex. 10)

———◆———

17. Donnelley has failed to prove by a fair preponderance of the evidence that there was an intent between the sellers and Donnelley to allocate any consideration to the covenant not to compete.

## II.

### THE TELEPHONE COMPANY CONTRACT

1. On February 15, 1954, Donnelley and the Illinois Bell Telephone Company (hereinafter "Bell") entered into a contract for the publication by Donnelley of an annual Chicago Street Address Telephone Directory for Bell.

2. Under the contract, Donnelley had the right to sell leases of the directory. For the convenience of Bell and its customers, Bell was to collect the billings on said leases and remit the same, taking into account certain adjustments for uncollectibles, to Donnelley on the twenty-fifth day of each month.

3. Under the contract, Donnelley agreed to pay Bell an amount equal to the excess of (1) net billings on leases over (2) the aggregate of specified costs incurred in publication plus three per cent, after federal income taxes, of the net billings to provide a profit. The costs and profit figure described in (2) are termed "the costs of publication" in the agreement.

4. Included in the specified costs of publication was interest at the prime rate from time to time effective on the net cost of publication.

5. Under Clause 18 of the contract, if, as of July 31, 1958, net billings were less than the cumulative costs of publication (including the profit figure), then Bell was to reimburse Donnelley for the difference, provided that such reimbursement would not exceed $320,159.35.

6. Donnelley's operations in connection with the Chicago Street Address Directory are shown in the following table for the calendar years 1953–1957 (Ex. 14):

CHICAGO STREET ADDRESS DIRECTORY

SUMMARY OF FIVE YEAR PROJECT (JOB) RESULTS

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
|---|---|---|---|---|---|---|---|
| | COSTS EXCLUDING 3% AFTER TAX FACTOR AND INTEREST | BILLING | COSTS (OVER) OR UNDER BILLING | | 3% AFTER TAX FACTOR PLUS INTEREST CHARGES | | TOTAL COSTS (INCLUDING 3% AFTER TAX FACTOR & INTEREST) IN EXCESS OF BILLING |
| YEAR ENDED DEC. 31 | | | CURRENT YEAR | CUMULATIVE | CURRENT YEAR | CUMULATIVE | |
| 1953 | $317,742.14 | $ 35,522.15 | $(282,189.99) | $ | $ 7,413.07 | $ | $(289,603.06) |
| 1954 | 191,833.05 | 184,775.30 | ( 7,057.75) | (289,247.74) | 23,044.74 | 30,457.81 | (319,705.55) |
| 1955 | 198,486.07* | 266,767.74 | 68,281.67 | (220,966.07) | 27,048.12 | 57,505.93 | (278,472.00) |
| 1956 | 211,977.44 | 339,627.05 | 127,649.61 | ( 93,316.46) | 30,575.44 | 88,081.37 | (181,397.83) |
| 1957 | 234,822.53 | 419,689.20 | 184,866.47 | 91,550.01 | 30,467.55 | 118,548.92 | ( 26,998.91) |

*Includes adjustment of 1954 of $521.99

7. In 1953 through 1957 Donnelley kept its accounts on an accrual basis; however, it did not deduct any of its costs under the contract nor report any of the billings thereunder in its profit and loss statements for any purposes until 1958. Thus, during 1953–1957 Donnelley did not treat as expenses or income for tax, dividend or profit and loss statement purposes any of the amounts shown in columns 1, 2 and 5 of Exhibit 14.

8. In no year between 1953 and 1957 was the cumulative excess of the cost of publication over the cumulative receipts from Bell greater than $320,159.35. Donnelley also had no reason to believe that Bell would not honor its obligation or would not be financially able to do so on July 31, 1958.

9. In the years 1953 through 1957 it was possible that, after the determination of the amounts shown in column 5 of Exhibit 14, the costs of publication, excluding the three per cent after tax factor and interest, would be so great that a reimbursement of $320,159.35 and the actual net billings would not suffice to cover the costs of publication (including profit and interest). However, at the end of 1953 and 1954 it was reasonably certain that Donnelley would receive the profit factor and interest for those years and at the end of 1955, 1956, and 1957 Donnelley had actually received the profit factor and interest for those years.

10. Donnelley had a fixed right to receive the income shown in column 5 of Exhibit 14 at the end of each respective taxable year.

### III.

### SALARY EXPENSE DEDUCTION[3]

1. On June 8, 1955, after closing of the sales contract with Messrs. Case, Shepperd, and Mann, employment agreements were executed by Donnelley with Mr. Case, Mr. Mann and Mr. Shepperd.

These contracts provided among other things as follows:

(a) *Contract of Case:*

"Salary will be $1,000. per month for May and June 1955, and thereafter through June 1957, at the rate of $1486. per month. Starting in July 1957, salary will continue at $1,000. monthly * * * This arrangement will run through December 1955, and shall then be renewed from calendar year to calendar year thereafter through 1959 and shall be further continued through April 1960, * * * If the foregoing full-time employment agreement is discontinued by mutual agreement or is not renewed * * * Mr. Case will continue in the employ of the company on a consulting basis through April, 1960, giving such time to such consultation work as shall be fair and equitable and appropriate to the proper furthering of the business, and at times which are reasonably convenient to both parties. His compensation on such basis shall be at the rate of $20,832.00 for the year 1956; $17,916.00 for the year 1957, and at the rate of $15,000.00 per year thereafter, up until April 1960. * * * In the event of Mr. Case's incapacity or death prior to June, 1957, the amount of $486.00 will be paid each month through June, 1957, to him or his estate." (Ex. A)

(b) *Contract of Mann:*

"Salary will be $1,000. per month for the months of May and June, 1955, and will continue thereafter at the rate of $1,486. per month so long as Mr. Mann is employed full-time pursuant hereto; provided however that if such full-time employment continues after July 1, 1957, his salary will be $1,000. per month.

"a. If this or any subsequent arrangement for full-time employment is not renewed, or is terminated at any

---

3. This section supplements Section I of the Findings of Fact and is also relevant contingently in the event that an appeal, if the plaintiff is so advised, results in reversal of any part of the judgment granted for the United States herein with respect to the taxable years 1955, 1956, and 1957.

time by the Corporation, Mr. Mann will continue as a consultant to the company on a retainer fee of $486. per month through June, 1957.

"b. In the event of Mr. Mann's death prior to June, 1957, the retainer fee will be paid monthly to his estate." (Ex. B)

(c) *Contract of Shepperd:*

"Mr. Shepperd's salary will be at the rate of $20,000. per year through the remainder of the year 1955, and at the rate of $31,667. per year through 1956, payable semi-monthly, effective May 1, 1955.

"1. If this or any subsequent agreement for full-time employment is not renewed, or is terminated at any time by the Corporation, Mr. Shepperd will continue as a consultant to the company and will be paid a retainer fee of $972. per month throughout the year 1956.

"2. In the event of Mr. Shepperd's death prior to December, 1956, the retainer fee will be paid monthly to his estate." (Ex. C)

2. These employment contracts provided "salary" payments at a higher rate during the first two years of employment of the said sellers in a ʟotal amount of $34,995. This is based on $486 per month for twenty-four months or $11,664 each for Case and Mann and $11,667 during 1956 for Shepperd. Moreover, in the event of their retirement from full-time employment or death during that period equivalent "retainer fees" were payable to the sellers or their estates. The plaintiff paid the $34,995 to the sellers and deducted that amount as a business expense in determining its taxable income for the years 1955, 1956 and 1957.

3. There is adequate evidence submitted on behalf of the United States to place the burden upon the plaintiff to show that the salaries of these sellers, making up the said sum of $34,995, were not paid as part of the purchase price of the stock of Case-Shepperd-Mann Publishing Corporation under the arrangements of June 8, 1955.

a. At the beginning of the negotiations between plaintiff and the sellers on April 25, 1955, which were concluded by their execution of the Agreement of Understanding, the sellers asked a price of $750,000, while the plaintiff's representative, Curtiss E. Frank, was authorized to offer only $715,000. To reach an agreement it was suggested that the difference of $35,000 could be paid to the sellers as part of the salaries which they would receive from Donnelley after its acquisition of the stock of Case-Shepperd-Mann Publishing Corporation. Frank agreed to these arrangements.

b. The contract of Case provided that Donnelley was to pay to him a bonus based on the "annual net profit of the above publications [referring to Fire Engineering, Water Works Engineering, Wastes Engineering, and Electricity on the Farm] after all expenses but before Federal Income taxes." In 1957, Case objected that the $486 per month paid to him during 1956 was a part of the purchase price of the Case-Shepperd-Mann papers and should not be included in plaintiff's expenses in the computation of the bonus due to Case. (See Ex. 15).

4. On February 11, 1957, K. G. Clement, a Donnelley executive, reporting to Frank with respect to Case's claim, stated: " * * * the exceptions at issue resolve themselves into what your intent was at the time of the execution of the agreements, and whether this intent can be read into them. As to (1) Did you have an unwritten understanding that the additional amount paid as salary to Mr. Case in connection with the purchase price should not be considered as an expense for bonus purposes? ($486 per month or $5,832 per year is apparently involved.)" (Ex. 16)

A report from Clement to Mr. James H. Evans of Donnelley, dated February 28, 1957, stated in effect that Mr. Frank had authorized a recomputation of Mr. Case's 1956 bonus, adding back to the book profit figure previously reported the additional compensation paid to Mr.

Case as salary, in connection with the purchase price of the Case-Shepperd-Mann papers. (Ex. 17)

5. Donnelley treated the contract of Case as if the additional compensation paid him were part of the purchase price. The contracts of Shepperd and Mann must be accorded similar treatment.

6. The additional $35,000 in services paid to Case, Shepperd and Mann was provided to sweeten the purchase price of the stock sold to Donnelley.

7. From the facts and circumstances herein, I find that the $34,995 which was paid to the sellers under the employment contracts was a capital expenditure by plaintiff and not deductible as a business expense in determining the taxable income for the years 1955, 1956, and 1957 and that the plaintiff has not shown by a fair preponderance of the evidence that the said sum was not a capital expenditure as above stated.

DISCUSSION

I.

COVENANT NOT TO COMPETE

"It is well established that an amount a purchaser pays to a seller for a covenant not to compete in connection with a sale of a business is ordinary income to the covenantor and an amortizable item for the covenantee unless the covenant is so closely related to a sale of good will that it fails to have any independent significance apart from merely assuring the effective transfer of that good will." Ullman v. Commissioner, 264 F.2d 305, 307–308, (2nd Cir. 1959) and cases cited in note 3 therein. There also seems no doubt that when the parties to a transaction have specifically set out the covenant in the contract and have there given it an assigned value, strong proof must be adduced by them in order to overcome that declaration. As Judge Waterman stated in Ullman v. Commissioner, supra at 308: "The tax avoidance desires of the buyer and seller in such a situation are ordinarily antithetical, forcing them, in most cases, to agree upon a treatment which reflects the parties' true intent with reference to the covenants, and the true value of them in money." See Balthrope v. Commissioner of Internal Revenue, 356 F.2d 28, 31 (5th Cir. 1966). Here there was no such agreement in the contract, and accordingly the burden is on Donnelley to overcome the wording of the agreement.

Donnelley here urges that the sellers declined to allocate merely because of tax reasons. An analogous argument was made by the sellers, the petitioners, in Ullman that the price of the covenants as stated in the contract was simply a fictitious allocation designed to benefit the tax position of the buyer and that the true value of the amounts was inconsequential. In the present case, the shoe is on the other foot, and the buyer, Donnelley, contends that it wanted an allocation and that the sellers did not. In Ullman, the Second Circuit left the parties where they had placed themselves. I see no reason to differ from that result here. In order for the court to remake the agreement of the parties, the plaintiff, Donnelley, must show that, notwithstanding the lack of a recital of a value for the covenant in the agreement, the parties, both the sellers and the buyer, nevertheless intended to allocate consideration to the covenant. Annabelle Candy Co. v. Commissioner of Internal Revenue, 314 F.2d 1, 7 (9th Cir. 1962). This Donnelley has not done.

The evidence shows clearly (a) that there was no important discussion between Donnelley and the sellers as to the allocation of a dollar value to the covenant before the June 8th closing (covenants were customary), (b) that there was no expression by the sellers to Donnelley that the covenant had substantial value, although they may have thought so to themselves, (c) that none of the sellers intended to allocate a dollar value to the covenant, and (d) that there was no discussion of allocation among the sellers. All that the testimony shows affirmatively with respect to the sellers is their unexpressed belief that the covenant had substantial value. While

the testimony shows that Donnelley would not have purchased the stock of the Case-Shepperd-Mann Publishing Corporation if it had not received a covenant not to compete, the evidence is not persuasive as to whether Donnelley expressed an intention to allocate to the sellers before the June 8th closing. What is clear is that after the closing Donnelly unilaterally set a value for the covenant on its books.

 "Intent" in tax law is probably confined to denoting "the immediate result desired by the actor." Paul, Motive and Intent in Tax Law, Selected Studies in Federal Taxation, Second Series, 257, 258, quoted in Weir v. Commissioner of Internal Revenue, 109 F.2d 996, 998 (3rd Cir.), cert. denied 310 U.S. 637, 60 S.Ct. 1080, 84 L.Ed. 1406 (1940). Intent may be proved by the words and conduct of the actor and also by the presumption that the actor intends the legal consequences of his act. See In re Richenell Fabric Mfg. Co., 31 F.Supp. 645, 648 (E. D.Pa.1940). Here there are, in my opinion, no words or conduct shown by the plaintiff on which to frame an inference that a bilateral intention to allocate existed before the closing.

 Thus, the issue here is reduced to the question: Does the mere fact that the parties may have had a belief that the covenant not to compete had a substantial value require an allocation of consideration to the covenant when there is no expressed intention by sellers or buyers to allocate and a definite intention of sellers *not* to allocate? I conclude that it does not and that the cases so hold.

Annabelle Candy Co. v. Commissioner, supra, in which a buyer was denied a deduction for amortization of a covenant, has many factors similar to those involved here. First, the agreement made by the parties made no allocation of any portion of the total consideration to the covenant. Second, no separate consideration was bargained for or paid for the covenant not to compete. Third, there was no expressed intention to allocate. Fourth, the covenant was apparently a benefit to the purchaser. Fifth, the buyer made a unilateral allocation of consideration to the covenant after the purchase agreement had been signed. The Annabelle Candy decision, thus, demonstrates that the mere fact that the parties may have considered the covenants valuable or that they are in fact of substantial value is not determinative. The basic question is the expressed intent of the parties. See also Radio Medford, Inc. v. United States, 150 F.Supp. 641 (D.Ore. 1957).

A superficial examination of the decision of the Seventh Circuit in Wilson Athletic Goods Mfg. Co. v. Commissioner of Internal Revenue, 222 F.2d 355 (7th Cir. 1955), would seem to indicate that the court held (a) that it is immaterial whether the contract did or did not define a specified amount as the value of the covenant, and (b) that, where the contract is silent, it becomes necessary for the court to determine from the other evidence whether the covenant had value and, if so, the amount thereof. An analysis of the facts in Wilson, however, shows that under the circumstances of that case the result was obtained solely because the elimination of the factor of good will left the covenant not to compete as the only intangible factor to which cost might be allocated. Wilson desired no good will—only the physical assets of the seller and the covenant not to compete. From the extrinsic facts plus the terms of the contract, an intention to allocate and the amount thereof were determined.

This court has found no cases from appellate courts in which a deduction has been allowed for the amortization of a covenant not to compete where there was no intent to allocate consideration to the covenant. See, e. g., Schulz v. Commissioner of Internal Revenue, 294 F.2d 52 (9th Cir. 1961); Commissioner of Internal Revenue v. Gazette Tel. Co., 209 F.2d 926 (10th Cir. 1954). Cf., e. g., Montesi v. Commissioner of Internal Revenue, 340 F.2d 97 (6th Cir. 1965); Barran v. Commissioner of Internal Revenue, 334 F.2d 58 (5th Cir. 1964);

Levine v. Commissioner of Internal Revenue, 324 F.2d 298 (3rd Cir. 1963); Ullman v. Commissioner of Internal Revenue, supra.

■■■ As Circuit Judge Wisdom wrote in Balthrope v. Commissioner of Internal Revenue, supra, 356 F.2d at 34:

"No one has to arrange his business affairs to satisfy the tax collector's appetite for revenues. But when a taxpayer has failed to arrange his affairs so as to minimize his taxes, he cannot expect the court to do it for him *nunc pro tunc.* * * * *"

Moreover, in Hamlin's Trust v. Commissioner of Internal Revenue, 209 F.2d 761, 765 (10th Cir. 1954), which involved an attempt by the taxpayers to extract themselves from an apparently definitive written allocation, Judge Bratton wrote:

" * * * where parties enter into an agreement with a clear understanding of its substance and content, they cannot be heard to say later that they overlooked possible tax consequences. * * * *"

Donnelley here seeks to import terms into its agreement with Case, Shepperd, and Mann which are neither explicit nor implied. There was no intention between the parties that the allocation which Donnelley would include should be part of the agreement.

The various estimates of the value of the covenant not to compete given by plaintiff's witnesses in the present case are no more than estimates. They do not indicate an intention of the parties to allocate consideration to the covenant. Moreover, the fact that the sellers entered into employment contracts with Donnelley does not indicate in any way an intention to allocate. In passing, I might also note that Donnelley probably overestimated the threat of competition from the sellers and the value of the covenant since it appears that at least two of the sellers, Mann and Shepperd, wanted to retire and that the sellers' corporation represented their life work.

The issue in this case is basically a question of fact on which plaintiff has not sustained its burden. I am forced to conclude that the plaintiff has failed to prove by a fair preponderance of the evidence that the parties (Donnelley and the sellers) intended to allocate consideration to the covenant.

## II.

### THE TELEPHONE COMPANY CONTRACT

■■■ The federal income tax system is based on an annual accounting. Heiner v. Mellon, 304 U.S. 271, 58 S.Ct. 926, 82 L.Ed. 1337 (1938). Under the federal system of taxation, income must be computed annually as the net result of all transactions within the year. Douglas v. Commissioner of Internal Revenue, 134 F.2d 762 (8th Cir. 1943), aff'd 322 U.S. 275, 64 S.Ct. 988, 88 L.Ed. 1271 (1944). Although the principle is not to be applied mechanically, it is "a well settled general rule that each year's transactions are to be considered separately, without regard to what the net effect of a particular transaction might be if viewed over a period of several years. Burnet v. Sanford & Brooks Co., 1931, 282 U.S. 359, 51 S.Ct. 150, 75 L.Ed. 383." Bradford v. Commissioner of Internal Revenue, 233 F.2d 935, 938 (6th Cir. 1956).

■■■ Unless some other permissible method is established which comes within the statutes,[4] the taxpayer is, thus, required, as heretofore indicated, to account on an annual basis rather than deferring the computation until later. In this connection Mr. Justice Stone, later Chief Justice, wrote:

" * * * A taxpayer may be in receipt of net income in one year and not in another. The net result of the two years, if combined in a single taxable period, might still be a loss; but it has never been supposed that that fact would relieve him from a tax on

---

4. Donnelley does not claim the benefit of the long-term contract method of accounting, Treas.Reg. § 1.851–3, or any other permissible method.

the first, or that it affords any reason for postponing the assessment of the tax until the end of a lifetime, or for some other indefinite period, to ascertain more precisely whether the final outcome of the period, or of a given transaction, will be a gain or a loss.

"The Sixteenth Amendment was adopted to enable the government to raise revenue by taxation. It is the essence of any system of taxation that it should produce revenue ascertainable, and payable to the government, at regular intervals. Only by such a system is it practicable to produce a regular flow of income and apply methods of accounting, assessment, and collection capable of practical operation. It is not suggested that there has ever been any general scheme for taxing income on any other basis. The computation of income annually as the net result of all transactions within the year was a familiar practice, and taxes upon income so arrived at were not unknown, before the Sixteenth Amendment. * * *"

Burnet v. Sanford & Brooks Co., 282 U.S. 359, 364–365, 51 S.Ct. 150, 152 (1931). Under the Regulations pertaining to accrual basis taxpayers as Donnelley, "income is to be included for the taxable year when all the events have occurred which fix the right to receive such income and the amount thereof can be determined with reasonable accuracy." Treas.Reg. § 1.446–1(c) (ii).

■ The general principles governing the accrual and reporting of income by taxpayers who employ the accrual basis of accounting are thus well settled. "[I]t is the *right* to receive and not the actual receipt that determines the inclusion of the amount in gross income. When the right to receive an amount becomes fixed, the right accrues." Spring City Foundry Co. v. Commissioner of Internal Revenue, 292 U.S. 182, 184–185, 54 S.Ct. 644, 645, 78 L.Ed. 1200 (1933).

■ The parties do not question the validity of these principles; they differ on their application to the amounts re-ceivable under the contract between Donnelley and Bell. Donnelley urges that no right to receive the profit factor and interest became fixed in this case until July 31, 1958 because only at that time did it become certain that Donnelley would earn the amounts shown in column 5 of Exhibit 14; Donnelley points out that at any other time before July 31, 1958 future costs of publication, excluding profit and interest, if they were sufficiently great, might wipe out the profit and interest which would then not be reimbursable. The government, on the other hand, urges that Donnelley's right to receive became fixed annually between 1953 and 1957. According to the government, in 1953 and 1954, when net billings were less than the costs of publication, Donnelley's right to receive the profit and interest figure was, nevertheless, fixed by the reimbursement in 1958 guaranteed by Bell. As to 1955, 1956, and 1957, the government points out that net billings exceeded costs of publication so that Donnelley's profit and interest under the contract for those years were actually received then.

Donnelley's argument disregards the settled principles stated in Heiner v. Mellon, 304 U.S. 271, 58 S.Ct. 926 (1938):

"* * * The federal income tax system is based on an annual accounting. [Footnote omitted] Under that law the question whether taxable profits have been made is determined annually by the result of the operations of the year." 304 U.S. at 275, 58 S.Ct. at 928.

See also other cases above cited. Donnelley would have the court conjecture as to the results of future operations. What is determinative here, in my opinion, is the facts as they existed at the end of each taxable year.

At the end of each year, the amount of profit and interest that Donnelley was to receive for that year was determinable by reference to the net billings and net cost. At the end of 1953 and 1954, although the profit factor and interest had not been received, the right to receive them was fixed with reasonable

certainty. Cf. Continental Tie & Lumber Co. v. United States, 286 U.S. 290, 52 S.Ct. 529, 76 L.Ed. 1111 (1932). Costs of publication, excluding profit and interest, in those years did not run sufficiently above billings that the actual receipt of the determinable amounts of profit and interest for those years was in jeopardy, since the difference between net billings and costs of publication was never greater than the reimbursement figure of $320,159.35. In my opinion, the right to receive those amounts for 1953 and 1954 must be considered fixed and subject to accrual as income in each of those years. As to 1955, 1956, and 1957, Donnelley actually received in each year the determinable amounts of profit and interest. To say that those amounts should not be included in income because future operations *may* wipe out the profit disregards the annual accounting concept. To my mind, the right to receive the profit and interest factor for 1955, 1956, and 1957 was fixed at the end of each of those years and those amounts must be reported as income.

■ A contingency that prevents accrual of income must be real and substantial, and vague possibilities that income may have to be returned or that it may possibly be subject to diminution or setoff will not alone suffice to postpone the accrual and reporting of taxable income. Universal Oil Products Co. v. Campbell, 181 F.2d 451, 470–472 (7th Cir. 1950). All in all, at the end of each taxable year, there was no real possibility that the income earned would be erased by subsequent events. Accordingly, the income must be accrued each year since the right to receive that income was fixed at the end of each year.

### III.

### SALARY EXPENSE DEDUCTION[5]

■ When a taxpayer seeks a tax refund he must be content to allow his tax to be corrected because of errors

through which he profited. Cuba R. R. Co. v. United States, 254 F.2d 280, 282 (2nd Cir.), cert. denied 358 U.S. 840, 79 S.Ct. 64, 3 L.Ed.2d 75 (1958). The reason usually given for allowing this equitable offset (even if at the time the defense was raised no new assessment could have been made because of the bar of the statute of limitations) is that an action for refund of taxes is in the nature of an action for money had and received and the taxpayer must establish that he in fact overpaid his taxes. Missouri Pacific R. R. Co. v. United States, 338 F.2d 668, 670 (Ct.Cl.1964). See also Dysart v. United States, 340 F.2d 624 (Ct.Cl.1965). "When a suit is brought for the recovery of taxes, the taxpayer must affirmatively show that he has overpaid his taxes since '[a]n overpayment must appear before refund is authorized.' Lewis v. Reynolds, supra, 284 U.S. [281] at 283, 52 S.Ct. [145] at 146 [76 L.Ed. 293]. In other words, the taxpayer has the burden of proving the exact dollar amount to which he is entitled." Missouri Pacific R. R. Co. v. United States, supra, 338 F.2d at 671.

The plaintiff relies on the following cases: Robert H. Heller, 18 CCH Tax Ct. Mem. 1139 (1959) and Fifth Avenue Coach Lines, Inc., 31 T.C. 1080 (1959), reversed in part on other grounds, 281 F.2d 556 (2nd Cir. 1960), cert. denied 366 U.S. 964, 81 S.Ct. 1915, 6 L.Ed.2d 1256 (1961). I fail to find anything in these cases to support plaintiff's contentions. The issue here is one of fact: Was the addition of $35,000 ($34,995) to the employment contracts actually a part of the purchase price of the stock? That question must be answered in the affirmative based on the relevant testimony and exhibits which are set out in Section III of the Findings of Fact.

### CONCLUSIONS OF LAW

1. Jurisdiction is conferred on this court by Internal Revenue Code of 1954, § 1346(a) (1).

---

5. This section is relevant contingently in the event that an appeal, if the plaintiff is so advised, results in reversal of any part of the judgment granted for the United States herein with respect to the taxable years 1955, 1956, and 1957.

2. Donnelley was not entitled to any deduction in 1955, 1956, and 1957 for amortization with respect to the covenant not to compete of Messrs. Case, Shepperd, and Mann.

3. The Internal Revenue Service properly included in plaintiff's taxable income for 1953 through 1957 Donnelley's three per cent profit figure, the federal income tax on that profit, and the interest on net cost earned by plaintiff in each year under its contract with Bell.

4. Should appeal result in reversal of any part of the judgment granted herein with respect to 1955, 1956, and 1957, the United States is entitled to a setoff on the ground that the additional compensation paid Case, Shepperd, and Mann should not have been deducted as an ordinary and necessary expense, but was, rather, a capital expenditure.

5. The United States is entitled to a judgment dismissing the complaint with costs.

Settle judgment on notice.